2014 IL App (2d) 130558-B
No. 2-13-0558
Opinion filed January 21, 2014

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* B'YATA I., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 09-JA-124 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, | ) | Mary Linn Green and |
| Petitioner-Appellee, v. Kenyatta B., | ) | Patrick L. Heaslip, |
| Respondent-Appellant). | ) | Judges, Presiding. |

JUSTICE HUDSON delivered the judgment of the court, with opinion.
Justices Hutchinson and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    In May 2013, the circuit court of Winnebago County found respondent, Kenyatta B., to

be an unfit parent with respect to her minor daughter, B'yata I., on three separate grounds.    The

court later concluded that the termination of respondent's parental rights was in B'yata's best

interests.    Respondent appealed.    In an opinion filed on November 20, 2013, we concluded

that the trial court's failure to set forth a written or oral factual basis for its finding of unfitness

prevented this court from conducting a meaningful review of its decision.    *In re B'yata I.*, 2013

IL App (2d) 130558, ¶¶ 30-40.    Accordingly, we retained jurisdiction over the appeal and

ordered a limited remand, strictly for the entry of the express factual basis supporting the trial

court's finding of unfitness.    *In re B'yata I.*, 2013 IL App (2d) 130558, ¶ 41.    Pursuant to our

directive, on December 16, 2013, the trial court issued a supplemental order setting forth the factual basis for its finding of unfitness. We now affirm the judgment of the trial court.

¶ 2                                    I.    BACKGROUND

¶ 3    B'yata was born to respondent on September 26, 2008. On March 27, 2009, the State filed a five-count petition alleging that B'yata was a neglected minor. 705 ILCS 405/2-3 (West 2008). The petition was amended on April 1, 2009. Both the original and amended petitions named Bernard I. as B'yata's father.[1] Respondent is also the mother of two other minors, Amashaneek T. and Alishawan T., who were fathered by a different man, Jesse T.[2] Respondent waived her right to a hearing on whether there was probable cause to believe that B'yata was a neglected minor, and the trial court, Judge Patrick L. Heaslip, granted temporary guardianship and custody of B'yata to the Illinois Department of Children and Family Services (DCFS). DCFS placed B'yata with relatives.

---

[1] DNA testing subsequently excluded Bernard as B'yata's father. Respondent later named Michael G. as a potential father. After DNA testing confirmed that Michael is B'yata's father, the State sought to terminate Michael's parental rights. The trial court found Michael unfit and concluded that it was in B'yata's best interests that his parental rights be terminated. In a separate appeal, this court affirmed the trial court's findings. See *In re B'yata I.*, 2013 IL App (2d) 130492-U.

[2] Amashaneek and Alishawan were subject to separate neglect petitions. Neither of their cases, however, is part of this appeal.

¶ 4    Following an adjudicatory hearing in September 2009, the trial court found B'yata neglected based on count III of the State's petition, which alleged that B'yata's environment was injurious to her welfare in that her parents engaged in domestic violence in her presence, thus placing her at risk of harm.   705 ILCS 405/2-3(1)(b) (West 2008).   In a dispositional order entered in December 2009, the trial court found it in B'yata's best interests that she be made a ward of the court.   The court placed custody and guardianship of B'yata with respondent.   The court also placed custody and guardianship of Amashaneek and Alishawan with respondent. The dispositional order required respondent to, *inter alia*, remain drug and alcohol free.   At that time, the trial court appointed Court Appointed Special Advocates (CASA) as guardian *ad litem* for all three minors.

¶ 5    At a review hearing in January 2010, Keith Tabor, the caseworker then assigned to respondent's case, noted that all three minors were residing with respondent, they were "[d]oing well," and they were all developmentally on target.   Tabor testified that a service plan had been established for the case.   Among other things, the service plan required respondent to undergo random urine drops and domestic-violence counseling.   Tabor stated that respondent had begun domestic-violence counseling and that she had completed a urine drop in January 2010, which was negative.   The next review hearing was held on April 27, 2010.   By that time, a different caseworker, Amelia Hernandez, was assigned to the case.   Hernandez noted that B'yata and her half-siblings still resided with respondent and that the minors were "doing good" in respondent's care.   Hernandez noted that respondent was participating in domestic-violence counseling, she was on a waiting list for "WAVE" counseling, and her drug screenings had been negative.

¶ 6    At a hearing on October 19, 2010, Hernandez reported that the minors were "doing great" in respondent's custody and that respondent had completed all required services.   Hernandez

stated that she had no concerns "whatsoever" about respondent's ability to protect the minors. Hernandez recommended that the case be closed. However, because of CASA's concerns regarding unsupervised contact between Bernard and the family, the court ordered that all previous orders would remain in effect. At a hearing on January 25, 2011, CASA recommended that the case be closed. The trial court, Judge Mary Linn Green, discharged CASA and continued the matter for possible closure.

¶ 7    However, on May 20, 2011, the State filed a motion to modify guardianship and custody of the three minors. In the motion, the State alleged that respondent was arrested for domestic battery on May 18, 2011, with the victim being Amashaneek. The State further alleged that this incident occurred in the presence of the other minors and that respondent failed to remain free of alcohol as required by the dispositional order entered in December 2009. The State requested that guardianship and custody of all three minors be transferred to DCFS. The same day, the trial court reappointed CASA. The parties waived their rights to a temporary-shelter-care hearing. The trial court granted temporary guardianship and custody of Amashaneek and Alishawan to Jesse. The court granted temporary guardianship and custody of B'yata to DCFS, with discretion to place her with a responsible relative or in traditional foster care. In addition, respondent was ordered to remain free of all illegal drugs and alcohol and to submit to random urine drops upon 24 hours' notice.

¶ 8    On July 15, 2011, the trial court heard and granted the State's motion to modify guardianship and custody. On the same date, the court entered a dispositional order granting legal custody of B'yata to DCFS, with discretion to place her with a responsible relative, in traditional foster care, or with Jesse. The same order granted Jesse legal guardianship and custody of Amashaneek and Alishawan. In addition, the court again ordered respondent to

remain drug and alcohol free and to submit to random urine drops upon less than 24 hours' notice. DCFS eventually placed B'yata with Jesse.

¶ 9 A permanency review hearing was scheduled for August 18, 2011, but was continued due to the illness of one of the attorneys. Meanwhile, on September 1, 2011, respondent pleaded guilty to aggravated battery of a child (720 ILCS 5/12-4.3 (West 2010)), based on the May 18, 2011, incident, and was sentenced to probation. On September 9, 2011, the court closed the case as to the two older children. At that time, Jesse was granted permanent legal custody and guardianship of Amashaneek and Alishawan. The court continued the matter as to B'yata for a permanency review hearing on March 6, 2012.

¶ 10 At the March 6, 2012, hearing, respondent was represented by an attorney, but she herself did not appear. At the hearing, caseworker Amber Rasmussen testified that she had been assigned to B'yata's case since July 2011. At that time, B'yata's goal was return home within 12 months. Rasmussen testified that B'yata had resided with Jesse and his wife, Aretha, since May 2011, and that all of B'yata's needs were being met. Rasmussen testified that respondent was entitled to supervised visitation and required to arrange visits through the agency. Rasmussen initially testified that respondent last visited B'yata on September 26, 2011. She later clarified that respondent "stopped by for Christmas, too." Rasmussen stated that respondent had not provided her with proof that she had completed a drug assessment and had not completed any of the requested drug screens as required by the service plans. Rasmussen acknowledged that respondent was not provided with a copy of the current service plan. She explained that she had intended to provide the service plan to respondent at a family-team meeting. Rasmussen scheduled two such meetings, one in December 2011 and one in January 2012, but respondent did not show up to either meeting. Rasmussen indicated, however, that

she communicated to respondent by telephone that she needed to complete a drug assessment. During the hearing, the trial court noted that Rasmussen had submitted a report to the court. The court stated that it did not find the report "very thorough." The court pointed out that the report did not reference the dates that the agency tried to contact respondent or when she was asked to do the urine drops and that it did not include a copy of the service plan. Based on the foregoing, the court found that respondent failed to make reasonable efforts. The court also found that DCFS failed to make reasonable efforts. The court set the permanency goal at return home within 12 months. The case was continued to April 5, 2012, for a status report as to the efforts of DCFS. On that date, the court found that DCFS was making reasonable efforts.

¶ 11    In June 2012, respondent was sentenced to two years' incarceration for probation violations and a new felony charge of failure to register as a violent offender against youth (730 ILCS 154/30 (West 2012)). At the next permanency review hearing, which was held on September 4, 2012, the court was informed that respondent was absent due to her incarceration. Rasmussen testified that B'yata was doing well with the foster parents. She recommended changing the permanency goal to substitute care pending termination of parental rights. Rasmussen noted that she had not had any contact with respondent since her incarceration. The court found that respondent had not made reasonable efforts or reasonable progress and, based on respondent's lack of progress, her incarceration, and the length of time the case had been pending, it adopted Rasmussen's recommendation to change the permanency goal.

¶ 12    On November 28, 2012, the State filed a motion for termination of respondent's parental rights, which was amended on December 6, 2012. The amended motion alleged four counts of unfitness. Count I alleged that respondent had failed to maintain a reasonable degree of interest, concern, or responsibility as to B'yata's welfare. See 750 ILCS 50/1(D)(b) (West

2012).   Count II alleged that respondent had failed to protect B'yata from conditions within the environment injurious to her welfare.   See 750 ILCS 50/1(D)(g) (West 2012).   Count III alleged that respondent was depraved.[3]   See 750 ILCS 50/1(D)(i) (West 2012).   Count IV alleged that respondent had failed to make reasonable progress toward B'yata's return to her within any nine-month period following the first nine-month period after B'yata's adjudication as a neglected minor.   See 750 ILCS 50/1(D)(m)(iii) (West 2012).   With respect to count IV, the State specified the following "nine-month" periods: (1) November 1, 2010, to July 1, 2011, and (2) May 17, 2011, to March 17, 2012.

¶ 13    The unfitness phase of the termination proceeding commenced on January 24, 2013.   At that hearing, Officer Sean Welsh of the Rockford police department testified that on May 18, 2011, he responded to a report of a mother "battering" her children.   When Officer Welsh arrived, he observed respondent with two children.   Rasmussen was then called to lay a foundation for the service plans. Rasmussen identified service plans dated May 12, 2009, July 21, 2009, August 18, 2009, September 10, 2009, May 12, 2010, March 4, 2011, November 2, 2011, April 26, 2012, and November 19, 2012.   Those service plans were admitted into evidence and the case was continued to April 3, 2013.

---

[3] The trial court subsequently granted the State's motion to dismiss count III of the amended motion, and it is not at issue on appeal.

¶ 14    When the hearing resumed, Rasmussen was recalled and she testified that since the last court date respondent had been released from jail and had contacted Rasmussen to set up visitation with B'yata.   Rasmussen testified that respondent had since visited B'yata twice, on March 22 and March 29, 2013.   Rasmussen testified that she supervised the one-hour visit on March 22 and that respondent's behavior was appropriate.   Following Rasmussen's testimony, the State moved to admit People's exhibits 13 through 15 and 22 through 24.   People's exhibit 13 is a certificate reflecting that on September 1, 2011, respondent was convicted of aggravated battery of a child.   People's exhibit 14 is a certificate reflecting that on June 26, 2012, respondent was convicted of failure to register as a violent offender against youth.   People's exhibit 15 is a certificate reflecting that on August 4, 2010, respondent was convicted of attempted forgery.   See 720 ILCS 5/8-4, 17-3 (West 2010).   People's exhibit 22 consists of the bill of indictment, guilty plea, and probation order related to respondent's conviction of aggravated battery of a child.   People's exhibit 23 consists of the bill of indictment, guilty plea, and sentence related to respondent's conviction of failure to register as a violent offender against youth.   People's exhibit 24 is the information, guilty plea, and conditional discharge order related to respondent's conviction of attempted forgery.   The trial court granted the State's motion to admit these exhibits.

¶ 15    Respondent testified that she had been incarcerated from May 18, 2011, through May 27, 2011, and from March 14, 2012, through February 28, 2013.[4]   Respondent testified that in April

---

[4] With respect to the first period of imprisonment, the probation order admitted into evidence as part of People's exhibit 22 indicates that respondent was actually incarcerated for a

2012 she received a service plan from Rasmussen requiring her to complete a drug and alcohol assessment and to participate in parenting classes, an anger management program, and domestic-violence counseling. Respondent stated that she completed all of the required services except for anger management. Respondent testified that she participated in a three-month drug and alcohol assessment program and in November 2012 presented Rasmussen a letter evidencing her participation in the program. She acknowledged that, to receive a certificate in the program, she would have had to complete a six-month program. Respondent stated that she could not complete a six-month program, because she was scheduled to be released from prison before she could do so. Respondent further testified that she completed parenting classes while incarcerated and presented evidence of such to Rasmussen in November 2012 and that she began domestic-violence counseling in September 2012. Respondent also noted that she placed her name on a waiting list for anger management while she was incarcerated, but was unable to participate in the program because she was released from prison before it started. Respondent acknowledged that her progress on her service plans was rated unsatisfactory, but she attributed this to the fact that she could not complete the services during

period of 107 days for the offense of aggravated battery of a child, presumably from May 18, 2011, the date of the offense, through September 1, 2011, the date respondent pleaded guilty. With respect to the second period of imprisonment, People's exhibit 23 indicates that respondent was taken into custody for failing to register as a violent offender against youth on March 14, 2012, released on March 22, 2012, and taken into custody again on April 24, 2012. She was formally sentenced to two years' imprisonment for that offense on June 26, 2012, and remained incarcerated until February 28, 2013.

the relevant six-month rating period. She explained that she had been incarcerated at multiple facilities and that not all services are available at each prison.

¶ 16    Respondent further testified that she kept in touch with Rasmussen while incarcerated. She stated, for instance, that she wrote to Rasmussen at least twice a month and requested visitation with B'yata. She noted that monthly visits at the prison began in October 2012. During these visits, she and B'yata played with toys, talked, and shared hugs and kisses. Respondent testified that B'yata appeared bonded to her and referred to her as "mommy." Respondent also related that she kept in touch with B'yata in other ways while in prison. She sent B'yata two letters a week and spoke to B'yata by telephone about five times. In addition, respondent testified that she asked Aretha about B'yata's progress in school and her medical appointments. Respondent testified that in November 2012 she was scheduled to participate in an administrative case review via telephone, but communication problems prevented her from doing so. Respondent stated that she wrote Rasmussen a letter about the incident and tried to file an appeal. However, Rasmussen did not receive the letter until after the time for filing the appeal had expired. Respondent testified that, since being released from prison, she had had phone contact with B'yata approximately twice a week.

¶ 17    On cross-examination, respondent noted that B'yata was initially removed from her care in March 2009, as a result of domestic violence, and remained in foster care until December 2009, when custody of B'yata was returned to her. Respondent acknowledged that B'yata was removed from her care a second time, in May 2011, because of a domestic-violence incident involving herself and Amashaneek, which resulted in respondent's conviction of aggravated battery of a child. Respondent agreed that, as a result of that conviction, she was required to register as a violent offender against youth and her failure to register resulted in incarceration.

Respondent stated that she was aware that, because she was on probation, the commission of a new offense would likely result in her being taken into custody and prevent her from caring for B'yata. Finally, respondent admitted that, between May 2011 and September 2012, she did not pursue domestic-violence counseling, but she stated that she had been "out of custody" during that period of time for "[j]ust a couple of days."

¶ 18    Aretha testified that B'yata lived with her, Jesse, Amashaneek, and Alishawan. Aretha stated that respondent wrote to the children about twice a month. According to Aretha, however, respondent never inquired about B'yata's medical care or her educational welfare. On cross-examination, Aretha acknowledged that in her letters respondent did inquire generally about how the children were doing. She also acknowledged that there was a bond between respondent and B'yata and that B'yata missed her mother.

¶ 19    Following closing arguments, the trial court continued the matter to May 2, 2013, for a decision on unfitness and a possible best-interests hearing. On that date, the court found that the State had proven respondent unfit by clear and convincing evidence pursuant to counts I, II, and IV of the amended motion to terminate parental rights. At the best-interests hearing, which immediately followed, the State asked the court to take judicial notice of the evidence presented at the unfitness phase.

¶ 20    Rasmussen then testified that since June 2011 B'yata has resided in a foster home with Jesse, Aretha, and her two older half-siblings. According to Rasmussen, B'yata has a good relationship with the foster parents, who are willing to adopt her. Rasmussen further testified that B'yata has a close relationship with her half-siblings. B'yata shares a room with Amashaneek and looks up to her as a role model. Rasmussen also noted that B'yata attends church with the foster parents, that she is in preschool, and that the foster parents have attended

B'yata's school meetings and conferences. In addition, B'yata has friends at school and in the neighborhood. Rasmussen acknowledged that there was some concern in the foster home because respondent had named another man as the possible father of Amashaneek and Amashaneek was having some difficulties with this news. Rasmussen recommended counseling for B'yata to help address this matter. In Rasmussen's opinion, B'yata should be freed for adoption so she could have a stable, permanent home where she knows the parents and is a part of a family unit.

¶ 21    On cross-examination, Rasmussen testified that B'yata has a bond with respondent. Rasmussen noted that since October 2012 respondent has regularly visited with B'yata. Further, respondent has spoken with B'yata by telephone through the foster parents, and the foster parents have indicated that they are willing to allow respondent to continue to have contact with B'yata if the adoption is completed. Rasmussen emphasized, however, that even though respondent and B'yata are bonded, she believes that it is in B'yata's best interests that respondent's parental rights be terminated. Rasmussen testified that she did not speak to the foster parents about establishing a guardianship in lieu of adoption.

¶ 22    Respondent testified that she and B'yata have a bond. She noted that, since her release from prison late in February 2013, she has had contact with B'yata by telephone and through letters. Respondent stated that she would be in favor of a guardianship so that B'yata could remain with the foster parents until respondent became established. Respondent testified that she resides with her mother and grandfather and that she recently found a job. She stated that she would be willing to participate in any services that the court recommends if it finds that it is not in B'yata's best interests to terminate her parental rights. Respondent acknowledged the aggravated battery of Amashaneek. She stated that to prevent such incidents in the future, she

is participating in an anger-management program. She related that she has learned to refrain from "any type of negativity" by removing herself from any confrontational situations.

¶ 23    The State called Jesse as a rebuttal witness. Jesse confirmed that he and Aretha are willing to adopt B'yata. He also opined that it is important for B'yata to have a relationship with her biological mother. He stated that he would allow respondent to visit B'yata after adoption, as respondent would be having contact with the two older children, with respect to whom respondent's parental rights are not being terminated. On cross-examination, Jesse testified that Rasmussen did not discuss a guardianship with him, but he was familiar with such an arrangement because of the other children. Jesse stated that his focus is on what is best for B'yata as an individual, whether it be adoption or guardianship.

¶ 24    Following closing arguments, the trial court announced its decision. The court noted that the focus at the best-interests phase of the proceeding is B'yata and no one else. Noting B'yata's strong bond with her half-siblings and the unusual position that the foster parents have taken in openly agreeing to maintain contact with a biological parent, the court terminated respondent's parental rights. The formal order of termination was entered on May 7, 2013. On May 21, 2013, respondent filed a notice of appeal.

¶ 25    On appeal before this court, respondent raised three arguments. First, she contended that this case should be remanded because the trial court failed to make any written or oral findings of fact to support its unfitness determination. Second, she argued that the State failed to prove her unfit by clear and convincing evidence. Third, she asserted that the trial court's finding that it is in B'yata's best interests to terminate her parental right is against the manifest weight of the evidence. See *In re B'yata I.*, 2013 IL App (2d) 130558, ¶ 27. As noted earlier, in an opinion filed on November 20, 2013, we concluded that the trial court's failure to make any written or oral

findings of fact to support its unfitness determination prevented us from conducting a meaningful review. *In re B'yata I.*, 2013 IL App (2d) 130558, ¶¶ 30-40. Thus, we retained jurisdiction over the appeal and ordered a limited remand, strictly for the entry of the express factual basis supporting the trial court's finding of unfitness. *In re B'yata I.*, 2013 IL App (2d) 130558, ¶ 41. In an order dated December 16, 2013, and filed with this court on December 23, 2013, the trial court detailed the factual basis in support of its finding. We now review the trial court's finding in light of the evidence presented at trial.[5]

¶ 26                              II. ANALYSIS

¶ 27    With the trial court now having entered its factual findings, we address the two remaining issues raised by respondent: (1) whether the State proved by clear and convincing evidence at least one ground of unfitness; and (2) whether the State proved by a preponderance of the evidence that it was in B'yata's best interests to terminate respondent's parental rights.

¶ 28    A parent's right to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of that right is a drastic measure. *In re Haley D.*, 2011 IL 110886, ¶ 90; *In re D.R.*, 307 Ill. App. 3d 478, 482 (1999). Accordingly, the Juvenile Court Act of 1987

---

[5] With respect to cases affecting the best interests of children, Illinois Supreme Court Rule 311(a)(5) (eff. Feb. 26, 2010) provides in relevant part that, "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." We have good cause for issuing our opinion more than 150 days after the filing of the notice of appeal because the case was not ready for disposition until one week prior to the 150-day deadline and because of the need to remand this cause to the trial court for additional factual findings. See *In re B'yata I.*, 2013 IL App (2d) 130558, ¶¶ 26, 41.

(Juvenile Court Act) provides a two-stage process for involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2012). Initially, the State must prove that the parent is unfit. 705 ILCS 405/2-29(2), (4) (West 2012); 750 ILCS 50/1(D) (West 2012); *In re Adoption of Syck*, 138 Ill. 2d 255, 277 (1990); *In re Antwan L.*, 368 Ill. App. 3d 1119, 1123 (2006). If the court finds the parent unfit, the State must then show that termination of parental rights would serve the child's best interests. 705 ILCS 405/2-29(2) (West 2012); *In re Adoption of Syck*, 138 Ill. 2d at 277; *In re Antwan L.*, 368 Ill. App. 3d at 1123.

¶ 29 With respect to the first stage of the termination process, section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2012)) lists various grounds under which a parent may be found unfit. *In re Antwan L.*, 368 Ill. App. 3d at 1123. The State has the burden of proving a parent's unfitness by clear and convincing evidence. 705 ILCS 405/2-29(2), (4) (West 2012); *In re Antwan L.*, 368 Ill. App. 3d at 1123. A determination of parental unfitness involves factual findings and credibility assessments that the trial court is in the best position to make. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889-90 (2004). As such, a trial court's determination of a parent's unfitness will not be reversed unless it is contrary to the manifest weight of the evidence. *In re Brianna B.*, 334 Ill. App. 3d 651, 655-56 (2002). A decision is against the manifest weight of the evidence "if a review of the record 'clearly demonstrates that the proper result is the one opposite that reached by the trial court.' " *In re Brianna B.*, 334 Ill. App. 3d at 656 (quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)).

¶ 30 In its amended motion to terminate respondent's parental rights, the State set forth four grounds of unfitness: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to B'yata's welfare (750 ILCS 50/1(D)(b) (West 2012)); (2) failure to protect B'yata from conditions within the environment injurious to her welfare (750 ILCS 50/1(D)(g)

(West 2012)); (3) depravity (750 ILCS 50/1(D)(i) (West 2012)); and (4) failure to make reasonable progress toward B'yata's return to her within any nine-month period following the first nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(iii) (West 2012)).[6] As the grounds for finding unfitness are independent, we may affirm the trial court's judgment if the evidence supports it on any one of the grounds alleged. *In re E.O.*, 311 Ill. App. 3d 720, 726 (2000).

¶ 31 With respect to the first ground of unfitness, section 1(D)(b) of the Adoption Act provides that a parent may be found unfit for "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2012). Since the language of the statute is in the disjunctive, any one of the three individual elements, *i.e.*, interest *or* concern *or* responsibility, may be considered by itself as a basis for unfitness. 750 ILCS 50/1(D)(b) (West 2012); *In re Richard H.*, 376 Ill. App. 3d 162, 166 (2007). In determining whether a parent has shown a reasonable degree of interest, concern, or responsibility for a minor's welfare, a court considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Completion of service plans may also be considered evidence of a parent's interest, concern, or responsibility. *In re Daphnie E.*, 368 Ill. App. 3d at 1065; *In re M.J.*, 314 Ill. App. 3d 649, 656 (2000). The court must focus on the parent's efforts, not his or her success. *In re Adoption of Syck*, 138 Ill. 2d at 279. In this regard, the court examines the parent's conduct concerning the child in the context of the

---

[6] As noted earlier, the trial court granted the State's motion to dismiss the allegation that respondent is unfit based on depravity, and that ground is not at issue on appeal.

circumstances in which that conduct occurred. *In re Adoption of Syck*, 138 Ill. 2d at 278. Accordingly, circumstances such as difficulty in obtaining transportation, poverty, actions and statements of others that hinder visitation, and the need to resolve other life issues are relevant. *In re Adoption of Syck*, 138 Ill. 2d at 278-79. Furthermore, if personal visits with the child are somehow impractical, other methods of communication, such as letters, telephone calls, and gifts, may demonstrate a reasonable degree of interest, concern, or responsibility, "depending upon the content, tone, and frequency of those contacts under the circumstances." *In re Adoption of Syck*, 138 Ill. 2d at 279. We are mindful, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). Rather, the interest, concern, or responsibility must be objectively reasonable. *In re Daphnie E.*, 368 Ill. App. 3d at 1064.

¶ 32    In its supplemental order upon remand, the trial court supported its finding of unfitness by emphasizing respondent's multiple convictions, her repeated incarcerations, her sporadic visitation with B'yata, and her lack of compliance with the service plans following her May 2011 arrest. The evidence supports these findings. In particular, the evidence establishes that, after the State filed its neglect petition in March 2009, temporary guardianship and custody of B'yata was granted to DCFS. DCFS placed B'yata with various relatives. Following an adjudicatory hearing in September 2009, the court found B'yata neglected. A dispositional hearing was held in December 2009, following which the trial court made B'yata a ward of the court, with guardianship and custody granted to respondent. At the same time, respondent was also granted guardianship and custody of her two other children, Amashaneek and Alishawan. The dispositional order required respondent to remain drug and alcohol free and to submit to random urine drops. By all accounts thereafter, B'yata was doing well in respondent's care.

Respondent had completed the services recommended for her, and Hernandez stated that she had no concerns "whatsoever" about respondent's ability to protect the children.

¶ 33    The case was pending closure when respondent was arrested on May 18, 2011, for domestic battery arising out of an incident involving Amashaneek.   Following the arrest, respondent was incarcerated and the State moved to modify custody and guardianship.   The trial court granted the State's motion, and DCFS was again granted custody and guardianship of B'yata.   She was eventually placed with Jesse.   On September 1, 2011, respondent pleaded guilty to the offense of aggravated battery of a child.    She was released from jail and sentenced to probation.

¶ 34    The first service plan following respondent's arrest was evaluated by Rasmussen on November 2, 2011.   Her progress on the plan was rated unsatisfactory overall.   Rasmussen noted that the May 2011 incident involved alcohol and that respondent had not contacted her since being released from jail.   At a permanency review hearing in March 2012, Rasmussen testified regarding respondent's contacts with B'yata since pleading guilty.   She stated that respondent visited B'yata on September 26, 2011, and once around Christmas, but failed to attend either of two scheduled family-team meetings.   Rasmussen further stated that respondent did not comply with tasks identified in her service plan, such as providing proof that she attended a drug assessment and completing requested drug screens.

¶ 35    Subsequently, respondent was incarcerated for a probation violation and a new charge, failure to register as a violent offender.   She was in custody from March 14, 2012, through March 22, 2012, and from April 14, 2012, through February 28, 2013.   The second service plan following respondent's May 2011 arrest was evaluated by Rasmussen on April 26, 2012.   That service plan indicates that on March 28, 2012, respondent contacted Rasmussen to schedule a

family-team meeting and a visit with B'yata. The one-hour visit occurred on March 29, 2012. On April 5, 2012, respondent attended a family-team meeting to discuss her service plan. At that time, respondent was asked to complete a drug assessment and a domestic-violence assessment, refrain from criminal behavior, and obtain housing and a legitimate income. Respondent again visited B'yata on April 19, 2012. Rasmussen rated respondent unsatisfactory on most tasks. Rasmussen noted that respondent did not provide documentation of a drug assessment, she had not completed any urine drops, she had been in and out of jail during the review period, she did not communicate with Rasmussen when going into and out of custody, due to her incarceration she failed to start domestic-violence counseling, and she frequently missed court and family-team meetings.

¶ 36 The next service plan was evaluated on November 19, 2012. Rasmussen again rated respondent unsatisfactory on most tasks. The service plan indicates that another family-team meeting was held on May 4, 2012, at the Winnebago County jail. In addition, the plan reflects that respondent was enrolled in a parenting program, she began a substance-abuse program on October 6, 2012, and she was on a waiting list for anger management. However, she had not enrolled in domestic-violence counseling. Respondent had one visit with B'yata during the review period, on October 30, 2012. Another requested visit was denied because of weather conditions. The record also shows that, after the review period, respondent had visits with B'yata on November 30, 2012, December 26, 2012, and January 23, 2013.

¶ 37 In April 2013, at the hearing on the State's amended motion for termination of parental rights, Rasmussen noted that, since being released from prison on February 28, 2013, respondent had visited B'yata twice. Rasmussen supervised one of the two visits and described respondent's behavior as appropriate. Respondent testified that she did not receive a service

plan until April 2012. She stated that the plan required her to participate in parenting classes and anger management and to complete a drug and alcohol assessment. Respondent testified that she completed parenting classes while incarcerated and presented evidence of such to Rasmussen in November 2012. Respondent further testified that she participated in a three-month drug and alcohol assessment program and presented to Rasmussen a letter as evidence of her participation. Respondent noted that while incarcerated she placed her name on a waiting list for anger management but that she was released before she was able to start the program. Respondent also indicated that in September 2012 she began domestic-violence counseling.

¶ 38    Respondent testified that she wrote to Rasmussen at least twice a month while incarcerated and requested visitation with B'yata. Respondent noted that monthly visits at the prison commenced in October 2012. Respondent talked and played with B'yata during those visits. Respondent testified that she kept in touch with B'yata in other ways while incarcerated. She stated that she wrote to B'yata twice a week and spoke to her by telephone at least five times. Respondent testified that she asked Aretha about B'yata's progress in school and her medical appointments. Respondent also stated that, since being released from prison, she has had telephone contact with B'yata about twice a week. Aretha confirmed that respondent had written to the children about twice a month, inquiring generally about how they were doing, but she denied that respondent had inquired about B'yata's health or education.

¶ 39    Based on these facts, the trial court determined that the State proved by clear and convincing evidence that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to B'yata's welfare. We cannot say that an opposite conclusion is clearly apparent. Respondent's contact with B'yata following her arrest in May 2011 was sporadic at

best. Between May 20, 2011, when the State filed its motion to modify custody and guardianship, and November 28, 2013, when the State filed its original motion for termination of parental rights, there were only five documented visits between respondent and B'yata (September 26, 2011, Christmas 2011, March 29, 2012, April 19, 2012, and October 30, 2012) plus a visit that was cancelled because of weather conditions. We acknowledge that, despite her incarceration for part of this time, respondent made efforts to contact B'yata by means other than visits. However, there were also substantial periods when she was not incarcerated and did not visit B'yata. In addition, respondent was rated unsatisfactory on most tasks set forth in the service plans in place after May 18, 2011. Indeed, the evidence suggests that she did not engage in many services or regularly visit with B'yata until shortly before the State filed its original motion for termination of parental rights. While respondent testified that she did not receive any service plan until April 2012, we note that she failed to appear at the family-team meetings in December 2011 and January 2012 where Rasmussen intended to provide her a copy of the service plan. Accordingly, we conclude that the trial court's conclusion that respondent was unfit for failure to maintain a reasonable degree of interest, concern, or responsibility is not against the manifest weight of the evidence. Since only one ground of unfitness need be shown (*In re E.O.*, 311 Ill. App. 3d at 726), we do not address the trial court's findings as they relate to the remaining two grounds of unfitness.

¶ 40 Respondent also argues that the trial court's finding that it was in B'yata's best interests that her parental rights be terminated is against the manifest weight of the evidence. According to respondent, granting guardianship of B'yata to the foster parents, rather than terminating her parental rights, would best serve B'yata's interests.

¶ 41  Once the trial court finds a parent unfit, it must determine whether termination of parental rights is in the minor's best interests.  *In re Anaya J.G.*, 403 Ill. App. 3d 875, 882 (2010).  As our supreme court has noted, at the best-interests phase, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life."  *In re D.T.*, 212 Ill. 2d 347, 364 (2004).  Section 1-3(4.05) of the Adoption Act (705 ILCS 405/1-3(4.05) (West 2012)) sets forth various factors for the trial court to consider in assessing a child's best interests.  The State bears the burden of proving by a preponderance of the evidence that termination is in the best interests of the minor.  *In re D.T.*, 212 Ill. 2d at 366; *In re Deandre D.*, 405 Ill. App. 3d 945, 953 (2010).  A trial court's best-interests finding will not be disturbed on appeal unless it is against the manifest weight of the evidence.  *In re Deandre D.*, 405 Ill. App. 3d at 953.  A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent.  *In re Brianna B.*, 334 Ill. App. 3d at 656 (quoting *In re M.K.*, 271 Ill. App. 3d at 826).

¶ 42  We conclude that respondent has not established that the trial court's best-interests finding is against the manifest weight of the evidence.  The trial court could have reasonably concluded that the stability and permanency that an adoption would provide were preferable to a guardianship.  At the time of the best-interests hearing, B'yata was 4½ years old.  Although the evidence suggests that respondent and B'yata had bonded, we note that B'yata had resided in the same foster home for almost two years.  There, she lives with her half-siblings, with whom she is also closely bonded.  She attends preschool and accompanies her foster parents to church.  According to Rasmussen, B'yata and the foster parents have a good relationship, the foster parents attend B'yata's school meetings and conferences, and B'yata has friends at school and in the neighborhood.  Jesse testified that he and Aretha are willing to adopt B'yata.  Given the

foregoing evidence, we cannot say that a conclusion opposite to the one reached by the trial court is clearly apparent. As such, we conclude that the trial court's finding that it was in B'yata's best interests to terminate respondent's parental rights is not against the manifest weight of the evidence.

¶ 43                                   V. CONCLUSION

¶ 44    For the reasons set forth above, we affirm the judgment of the circuit court of Winnebago County.

¶ 45    Affirmed.