NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230433-U

NO. 4-23-0433

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 5, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.L., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Rock Island County |
| Petitioner-Appellee, | ) | No. 19JA93 |
| v. | ) | |
| Julien S., | ) | Honorable |
| Respondent-Appellant). | ) | Theodore G. Kutsunis, |
| | ) | Judge Presiding. |

---

JUSTICE ZENOFF delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1      *Held*: The appellate court affirmed the trial court's order terminating respondent's parental rights where the court's findings were not against the manifest weight of the evidence.

¶ 2      The trial court found respondent, Julien S., to be an unfit parent and determined that it was in the best interest of respondent's minor daughter, J.L., to terminate respondent's parental rights. Respondent appeals, arguing that the court's findings were against the manifest weight of the evidence. We affirm.

¶ 3      I. BACKGROUND

¶ 4      On September 11, 2019, the State filed petitions for adjudication of wardship and for temporary custody, alleging that J.L. was neglected and that J.L.'s environment was injurious to her welfare. The State asserted that J.L.'s mother, K.L., suffered from untreated mental health and anger issues and had been involved in multiple relationships with men involving domestic

abuse. (We note that K.L.'s parental rights are not at issue in this appeal, as K.L. agreed to surrender her parental rights and consented to J.L.'s adoption.) As it relates to respondent, the petition asserted that he was a registered sex offender and that, at one point, K.L. had given respondent "access" to one of her children. The petition asserted that respondent was under house arrest, wearing an ankle monitor, and police located him hiding under a bed in K.L.'s home with a large sum of cash and baggies of marijuana.

¶ 5        Also on September 11, 2019, respondent appeared and entered his appearance *pro se*. Respondent and K.L. stipulated to granting temporary custody of J.L. to the Illinois Department of Children and Family Services (DCFS) for appropriate placement. The trial court awarded temporary custody of J.L. to DCFS. The court then appointed counsel for respondent and K.L.

¶ 6        On December 26, 2019, DCFS filed (1) a dispositional report prepared by a caseworker with Bethany for Children & Families (Bethany) and (2) an integrated assessment. In the dispositional report, DCFS indicated that there were "significant concerns" regarding respondent's ability and willingness to meet the needs of J.L. The report stated that respondent "failed to attend court hearings regarding his daughter, failed to participate in an [integrated assessment] interview, and has failed to coordinate parent/child visits with the case worker." DCFS thus recommended that respondent participate in an integrated assessment interview to assess his strengths, needs, parenting, mental health, substance abuse, criminal history, and relationship history. The report further noted that respondent was a sexual predator with a victim under the age of 18, but there was not a "complete picture" of respondent's sexual offense history. Thus, DCFS recommended that respondent participate in a psychosexual assessment to determine his recidivism risk.

¶ 7        The integrated assessment indicated that while respondent did not participate in an integrated assessment interview, K.L. did. K.L. reported that she had been involved in eight or nine relationships involving verbal or physical violence. K.L. further explained that she was involved in an intermittent relationship with respondent for approximately four years and did not learn that he was a registered sex offender until after an argument between them led to a neighbor calling the police. K.L. denied any physical violence in her relationship with respondent.

¶ 8        The integrated assessment reported that the prognosis for reunification between respondent and J.L. was poor. This prognosis was based on the following. Respondent failed to show for his scheduled integrated assessment interview. Additionally, while respondent inquired as to the wellbeing and safety of J.L., he failed to make efforts to engage in services. Further, respondent had been minimally involved in J.L.'s life. Moreover, respondent was a registered sex offender, and the nature of respondent's conviction, participation in treatment, and risk of recidivism remained unknown.

¶ 9        Respondent failed to appear for the next hearing, which was held on January 10, 2020, but his counsel was present. Respondent's counsel explained that he was unable to establish contact with respondent by phone. The trial court adjudicated J.L. neglected and found respondent to be unfit for failing to participate in services or involve himself in J.L.'s life. The permanency goal was set for return home within 12 months. In a supplemental order, the court required respondent to complete an integrated assessment and a psychosexual assessment. The court further ordered respondent to comply with any recommendations.

¶ 10       Over the next approximately three years, the trial court held several permanency review hearings. For the hearings, DCFS filed (1) permanency hearing reports prepared with the

assistance of Bethany caseworkers and (2) service plans identifying tasks respondent needed to complete to achieve reunification with J.L.

¶ 11    On March 11, 2022, the goal of reunification was changed to substitute care pending termination of parental rights.

¶ 12    On May 6, 2022, the State filed a "Supplemental Petition to Terminate Parental Rights." The State alleged that respondent was unfit as follows: (1) respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) respondent failed to make reasonable progress toward the return of J.L. during any nine-month period following the adjudication of neglect, *i.e.*, January 11, 2020, through October 11, 2020; October 12, 2020, through July 12, 2021; and July 13, 2021, through April 13, 2022 (750 ILCS 50/1(D)(m)(ii) (West 2020)); and (3) respondent evidenced an intent to forgo his parental rights (750 ILCS 50/1(D)(n) (West 2020)). The petition further alleged that it was in J.L.'s best interest to terminate respondent's parental rights.

¶ 13    On September 26, 2022, respondent submitted a letter to the trial court in which he indicated that he was incarcerated. In the letter, respondent also purported to give his parental rights over J.L. to his mother while he was incarcerated.

¶ 14    At a hearing on January 20, 2023, K.L. confirmed her intent to surrender her parental rights over J.L. During the hearing, the State noted that "before we convened, [respondent] was on Zoom video conference" having a discussion with his counsel. The State explained that it was informed that respondent "also intends to sign [a consent] and surrender" his parental rights.

¶ 15    A fitness hearing was scheduled for April 28, 2023. On that date, respondent's counsel was present, but respondent failed to appear. Respondent's counsel requested a continuance. Counsel asserted that respondent had informed him "he was going to sign consents."

- 4 -

However, counsel explained that he had since had difficulty communicating with respondent, because respondent had been released from custody and was living with his mother, who was "making it very difficult to communicate" with respondent. Counsel asserted that respondent's mother was failing to tell respondent that counsel was calling, and he did not know if respondent was receiving his letters. The trial court denied the request for a continuance, explaining that respondent "had opportunities to get involved" and "had ways to contact" counsel if he desired.

¶ 16    Accordingly, the trial court proceeded with the fitness hearing. The State called Katelynn Ramirez as a witness, who testified to the following. Ramirez was a child welfare specialist with Bethany and became the assigned caseworker for J.L. in January 2022. Ramirez explained that J.L. came into care after DCFS received a hotline call regarding a domestic dispute between K.L. and one of K.L.'s paramours in the presence of J.L. K.L. had since consented to J.L.'s adoption. As to respondent, Ramirez explained that his paternity had been established through court proceedings in Iowa. She noted that a caseworker who was previously assigned to the case had been in contact with respondent, so respondent "absolutely" knew that the case was ongoing. However, Ramirez herself had never been in contact with respondent, and respondent had never reached out to her. Respondent's last known location was the Clarinda Correctional Facility in Iowa, where he was incarcerated for failing to register as a sex offender. Ramirez confirmed that respondent was no longer incarcerated at that facility, but she did not know where he was currently. Ramirez explained that, after J.L. was adjudicated neglected, respondent was ordered to undergo an integrated assessment and a sexual offender evaluation. Ramirez testified that respondent had completed neither assessment. Additionally, respondent had not (1) provided support or gifts to J.L., (2) visited with J.L., (3) expressed any interest in J.L., (4) maintained contact with J.L., or (5) planned for the future of J.L. Ramirez was aware of nothing that prevented

respondent from doing any of the foregoing for J.L. Ramirez testified that she reviewed the court reports and other documents in the case and did not think respondent had made progress during the nine-month periods of (1) January 11, 2020, through October 11, 2020; (2) October 12, 2020, through July 12, 2021; and (3) July 13, 2021, through April 13, 2022.

¶ 17　　　　On cross-examination, Ramirez discussed her efforts to contact respondent. Ramirez explained that she conducted a "diligent search" and sent confirmation letters via certified mail and regular mail to the addresses at which respondent might have resided. Some addresses were for residences, while one was for a prison. Ramirez explained that no signed certifications were returned to her, and some of the certifications were returned as "not deliverable." Ramirez acknowledged it was possible that respondent did not know she was his new caseworker.

¶ 18　　　　On redirect examination, Ramirez testified that when respondent appeared via video call in the proceedings, he was incarcerated.

¶ 19　　　　Following this testimony, the State argued that respondent should be found unfit. The State explained that respondent "clearly was aware that [the case] existed," as he entered his appearance and appeared by video call on one occasion. However, respondent chose to "absent himself from the child's life," completed no services, and failed to reach out to the caseworker.

¶ 20　　　　Respondent's counsel argued that the State failed to meet its burden to show that respondent was unfit, because there was no evidence confirming that respondent had received any communication from the caseworker informing respondent of his responsibilities.

¶ 21　　　　The trial court found that respondent (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to J.L.'s welfare, (2) failed to make reasonable progress toward J.L.'s return during the specified nine-month periods, and (3) evidenced an intent to forgo his parental rights. In support of these findings, the court explained that respondent knew about

the case but failed to participate in an integrated assessment and a psychosexual assessment. Additionally, the court noted that respondent never contacted J.L., provided J.L. with gifts or support, visited J.L., or expressed any interest as to J.L.'s welfare or well-being. Further, respondent failed to communicate with the caseworker despite being able to do so. Accordingly, the court found that respondent was an unfit parent.

¶ 22        During a recess, the State filed a best interest report prepared by Bethany. The report indicated the following. J.L. and her two siblings entered their current placement on May 3, 2021, and this placement was willing to provide permanency. J.L.'s foster parents were providing for J.L.'s safety, educational, developmental, well-being, and medical needs. J.L. viewed her foster parents as her mother and father, displayed a significant attachment to them, and was "very bonded" to them. J.L. was thankful to live with her siblings and sought out her foster parents for support and comfort. J.L.'s foster parents were involved in J.L.'s education as well as her health and psychiatric treatment. J.L. loved her foster parents who, in turn, loved her. J.L.'s foster parents resided in a five-bedroom home and were employed full-time. Additionally, they had friends and family who were willing to provide assistance and support as needed. The report recommended that respondent's parental rights over J.L. should be terminated, J.L. should remain with her foster parents, and the goal should be changed to adoption.

¶ 23        Following the recess, the trial court proceeded to a best interest hearing. The State requested the court to take judicial notice of the best interest report and indicated that it would rest on that report. The State argued that respondent's parental rights should be terminated and requested that the goal be changed to adoption. Respondent presented no witnesses, and his counsel argued that J.L. should be placed with respondent's mother, per his wishes in his letter to the court. The court stated that it accepted the best interest report as evidence. The court found that

J.L.'s safety, educational, developmental well-being, and medical needs were being met by the foster parents, whom she considered her mother and father. The court further found that J.L. displayed a significant attachment to her foster parents and was bonded to them. Accordingly, the court found that it was in J.L.'s best interest that respondent's parental rights be terminated, that J.L. remain in her current placement, and that the goal be changed to adoption.

¶ 24        This appeal followed.

¶ 25                                    II. ANALYSIS

¶ 26        Respondent argues that the trial court's findings as to both parental unfitness and J.L.'s best interest were against the manifest weight of the evidence.

¶ 27        Involuntary termination of parental rights under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) is a two-step process. *In re D.D.*, 2022 IL App (4th) 220257, ¶ 27. First, the State must prove by clear and convincing evidence that the parent is unfit under any ground listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *D.D.*, 2022 IL App (4th) 220257, ¶ 27. If the trial court finds that a parent is unfit, the State must then prove by a preponderance of the evidence that it is in the minor's best interest that parental rights be terminated. *D.D.*, 2022 IL App (4th) 220257, ¶ 27.

¶ 28        We accord great deference to the trial court's findings in matters involving minors because the court is in the best position to determine the credibility and weight of the witnesses' testimony, having observed the demeanor and conduct of the parties and witnesses. *D.D.*, 2022 IL App (4th) 220257, ¶ 28. We will not disturb the court's unfitness and best-interest findings unless they are contrary to the manifest weight of the evidence. *D.D.*, 2022 IL App (4th) 220257, ¶ 28. A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *D.D.*, 2022 IL App (4th) 220257, ¶ 28.

¶ 29                               A. Unfitness

¶ 30        Respondent first argues that the trial court's finding that he is unfit is against the manifest weight of the evidence. Specifically, respondent claims that the court erred in determining that he failed to maintain a reasonable degree of interest, concern, or responsibility for J.L.

¶ 31        Initially, the State argues that because respondent challenges only the trial court's finding that he failed to maintain a reasonable degree of interest, concern, or responsibility for J.L., respondent concedes unfitness on the remaining two grounds upon which the court found he was unfit, *i.e.*, that respondent failed to make reasonable progress toward J.L.'s return during any nine-month period following the adjudication of neglect and that respondent evidenced an intent to forgo his parental rights. Respondent does not address the State's argument. Instead, he asserts in his reply brief that he stands on the arguments in his initial brief to show that he "maintained a reasonable degree of interest, concern, or responsibility" as to J.L. Because respondent does not contest that he conceded unfitness on the unchallenged grounds, we accept respondent's concession. See *In re D.L.*, 326 Ill. App. 3d 262, 268 (2001) (concluding that the respondents conceded unfitness where they challenged only one ground upon which the trial court based its unfitness finding and remaining unchallenged grounds could independently support the finding of unfitness).

¶ 32        Respondent's concession alone establishes his unfitness. We nevertheless reject respondent's argument that the trial court's finding that respondent was unfit for failing to maintain a reasonable degree of interest, concern, or responsibility was against the manifest weight of the evidence.

¶ 33        The Adoption Act provides that a parent may be found unfit, *inter alia*, for "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's

welfare." 750 ILCS 50/1(D)(b) (West 2022). "In determining whether a parent has shown a reasonable degree of interest, concern, or responsibility for a minor's welfare, a court considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare." *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. The completion of service plans is also considered evidence of a parent's interest, concern, or responsibility. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. The court should focus on the parent's efforts, not his or her success. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. Thus, the court examines the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. Accordingly, circumstances such as a parent's difficulty in obtaining transportation, poverty, actions and statements of others that hinder visitation, and the need to resolve other life issues are relevant considerations. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. If personal visits with the child are impractical, other methods of communication including letters, telephone calls, and gifts may demonstrate a reasonable degree of interest, concern, or responsibility, depending on the content, tone, and frequency of those contacts. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. A parent is not fit simply because he or she demonstrates some interest or affection toward the child. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. Instead, the interest, concern, or responsibility must be objectively reasonable. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31.

¶ 34　　　　Respondent claims that the trial court's unfitness finding failed to account for his lack of contact, notice, or opportunity to engage in the case due to his incarceration. Respondent further claims that, although he was not present for many court hearings or appointments, the record evidenced his interest in J.L., as he was present at the first appearance hearing, spoke with

a Bethany caseworker, mailed a letter to the court, and spoke with his attorney via Zoom prior to a hearing.

¶ 35        This argument is unavailing. Respondent's claims that he lacked contact, notice, or an opportunity to engage in the case due to his incarceration are belied by the record. On September 11, 2019, at the outset of the proceedings, respondent was present at an initial hearing, and counsel was appointed for him that day. Accordingly, respondent was aware that these proceedings were occurring. The record also establishes that respondent was able to communicate with Bethany caseworkers, as he had been in contact with one prior to Ramirez's assignment to the case. Likewise, when respondent was incarcerated, he was able to contact his counsel, as he spoke with his attorney via a video call prior to the January 20, 2023, hearing to express his intent to surrender his parental rights. Respondent also sent a letter directly to the trial court regarding his wishes pertaining to J.L.'s custody. Given respondent's knowledge of the case and his ability to communicate with caseworkers, his attorney, and the court itself—even while incarcerated—we reject respondent's claim that he was unable to engage in the proceedings.

¶ 36        Respondent also contends that, given his incarceration, it is "unreasonable to think" he could attend any hearings, assessments, or visits with J.L., because he was "likely" unable to attend "due to matters beyond his control." This argument misses the mark. Nothing in the record indicates that respondent was incarcerated for the entirety of the proceedings, and respondent could have involved himself in the case and J.L.'s life during the period in which he was not incarcerated. Further, even for that period during which visits might have been impractical due to respondent's incarceration, respondent could have shown an interest in J.L. through letters, telephone calls, and gifts. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. However, the record establishes that respondent largely absented himself from the proceedings and made little effort to maintain contact with J.L.

¶ 37 Ramirez's testimony supports that conclusion. Ramirez testified that a previous caseworker assigned to the case had contacted respondent, but she herself had not been able to contact him despite her diligent attempts to do so. Respondent, in turn, had never reached out to Ramirez, even though he was "absolutely" aware of the ongoing proceeding. Ramirez explained that respondent completed neither the integrated assessment nor the psychosexual assessment, despite being ordered to do so. Moreover, respondent did not visit J.L., provide her support, express any interest in her, or plan for her future. While respondent may have expressed some interest or affection toward J.L. by, for example, his letter to the trial court, this alone was not enough for respondent to be deemed fit. See *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. Respondent was required to show interest, concern, or responsibility toward J.L. that was objectively reasonable. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. Respondent's failure to visit with, maintain contact with, or provide support to J.L. did not meet that standard.

¶ 38 Based upon the foregoing, we hold that the trial court's finding that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to J.L.'s welfare was not against the manifest weight of the evidence.

¶ 39 B. Best Interest

¶ 40 Next, respondent argues that the trial court's finding that the termination of his parental rights was in J.L.'s best interest is against the manifest weight of the evidence.

¶ 41 Following an unfitness finding, the focus shifts to the child. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 69. At a best interest hearing, the issue is no longer whether parental rights can be terminated; instead, the issue is whether, in light of the child's needs, parental rights *should* be terminated. *C.P.*, 2019 IL App (4th) 190420, ¶ 69. In determining whether termination is in the

child's best interest, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least[-]disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *C.P.*, 2019 IL App (4th) 190420, ¶ 70 (quoting *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 52).

¶ 42    Respondent contends that the trial court's rationale for terminating his parental rights to J.L. "was based upon the fact that J.L. had apparently adjusted well to life with the foster family and needed permanence" without considering J.L.'s relationship with respondent. Respondent asserts that the "best interests of J.L. cannot accurately be determined" without considering the relationship between J.L. and respondent. This argument is unavailing. Respondent points to nothing in the record establishing the state of the relationship between him and J.L. Indeed, respondent acknowledges that the "record is devoid of any reference to the time that [he] and J.L. spent together." Respondent merely speculates that "*presumably* there was at least some contact that allowed J.L. the ability to bond with her father." (Emphasis added.)

¶ 43    In any event, respondent disregards that the focus of the hearing is the child, not the interests of the parent. At a best-interest hearing, the parent's interest in maintaining a

relationship with the child must yield to the child's interest in a stable, loving home life. *C.P.*, 2019 IL App (4th) 190420, ¶ 69. In finding that it was in J.L.'s best interest to terminate respondent's parental rights, the trial court noted that J.L.'s foster parents consistently met J.L.'s safety, educational, developmental well-being, and medical needs. The court further stated that J.L. viewed her foster parents as her mother and father, displayed a significant attachment to them, and was bonded to them.

¶ 44    The evidence supports the trial court's findings. The best interest report established that J.L. and her siblings were placed with J.L.'s foster parents in May 2021. The report further indicated that J.L.'s foster parents provided for J.L.'s safety, educational, developmental, well-being, and medical needs. Additionally, J.L. was "very bonded" to her foster parents, whom she viewed as her mother and father. The report explained that J.L. sought out her foster parents for support and comfort and that her foster parents were involved in her education and health treatments. Further, the report indicated that J.L. loved her foster parents, who in turn, loved her. Finally, the report indicated that J.L.'s foster parents lived in a five-bedroom home, were employed full-time, and had friends and family who could provide support as needed. From this evidence, the court could reasonably conclude that the termination of respondent's parental rights and the placement of J.L. with her foster parents facilitated J.L.'s interest in a stable, loving home life.

¶ 45    Accordingly, we hold that the trial court's finding that it was in J.L.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 46                        III. CONCLUSION

¶ 47    For the reasons stated, we affirm the trial court's judgment.

¶ 48    Affirmed.