2020 IL App (2d) 191078-U
No. 2-19-1078
Order filed March 30, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* G.D., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 18-JA-318 |
| | ) | |
| | ) | Honorable |
| (People of the State of Illinois, Petitioner- | ) | Francis M. Martinez, |
| Appellee v. Cheryl D., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices McLaren and Hudson concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The judgment terminating the respondent's parental rights was affirmed where (1) the trial court's findings were not against the manifest weight of the evidence and (2) the purported evidentiary errors did not compel reversal of the judgment.

¶ 2     Respondent, Cheryl D., appeals an order terminating her parental rights to her minor daughter, G.D. We affirm.

¶ 3                                I. BACKGROUND

¶ 4     The minor was born in March 2016 to respondent and Darryl D. Darryl has never been involved in the minor's life, and he is not a party to this appeal.

¶ 5     On September 21, 2018, the State filed a neglect petition. In count I, the State alleged that

the minor's environment was injurious to her welfare, in that respondent had a substance abuse issue that prevented her from properly parenting, thereby placing the minor at risk of harm. In count II, the State alleged that the minor's environment was injurious to her welfare, in that respondent "became intoxicated and minor was outside without supervision," thereby placing the minor at risk of harm. In count III, the State alleged that the minor's parent or other person responsible for her welfare left her "without supervision for an unreasonable period of time without regard for the mental or physical health, safety, or welfare of the minor," in that respondent "became intoxicated and minor who is 2 years old was outside without supervision."

¶ 6    Following a shelter-care hearing on September 21, 2018, the court determined that there was probable cause to believe that the minor was neglected. The court appointed the Department of Children and Family Services (DCFS) as the minor's temporary guardian and custodian, with discretion to place her with a responsible relative or in traditional foster care.

¶ 7    On December 18, 2018, the parties entered an agreed adjudicatory order. Respondent stipulated that the minor was neglected pursuant to count I of the petition. The State dismissed the other two counts in exchange for respondent's agreement to complete services based on all counts of the petition.

¶ 8    On January 23, 2019, the parties entered an agreed dispositional order. Pursuant to this agreement, the court appointed DCFS as the minor's guardian and custodian, with the discretion to place her with a responsible relative or in foster care. Respondent was ordered to cooperate with all drug, alcohol, and psychological treatment and services required by DCFS and its contracting agencies. The goal was set as return home within 12 months. Respondent did not appeal this order.

¶ 9    The court held a permanency review hearing on July 3, 2019. In a proffer submitted by

her attorney in lieu of testimony, respondent candidly acknowledged that her "mental health has been a detriment during this review period and that she has attempted rather unsuccessfully to engage in a variety of services." Respondent indicated that she intended to submit herself over the coming weekend for inpatient psychiatric treatment to attempt to stabilize her mental health. The court found that respondent had failed to make reasonable efforts toward the return of the minor. The court changed the goal to substitute care pending court determination of termination of parental rights.

¶ 10    On July 15, 2019, the State petitioned to terminate respondent's parental rights on two grounds: (1) failure to protect the minor from conditions within her environment that were injurious to her welfare (750 ILCS 50/1(D)(g) (West 2018)) and (2) failure to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2018)).

¶ 11                        A. Unfitness Hearing

¶ 12    Stephanie Sanders, a DCFS caseworker who had been assigned to the minor's case since September 19, 2018, testified for the State at the unfitness hearing as follows.

¶ 13    Although she was not a therapist, Sanders had concerns about respondent's mental health, because respondent reported being psychiatrically hospitalized numerous times and she "seemed unstable" to Sanders. It was also clear to Sanders from the information that she received from others that respondent "needed to see a therapist and a psychiatrist to get stable." For example, one contracted worker who transported respondent to visits with the minor refused to continue doing so after respondent engaged in "ranting and raving" behavior. A replacement transporter likewise refused to work with respondent after only a few days. DCFS asked respondent to complete a mental health assessment, but Sanders never received documentation that respondent

completed that assessment prior to the goal change.

¶ 14    Sanders explained that, throughout the life of this case, respondent missed multiple drug drops and tested positive for opiates and benzodiazepines.  Respondent told Sanders that she was prescribed medications for physical and mental conditions, but respondent failed to provide proof of that fact despite Sanders's requests.  On one occasion in May 2019, Sanders asked to see respondent's medication, and respondent gave her a white Tylenol bottle with no label on it.  The bottle contained red Skittles.

¶ 15    Sanders testified that DCFS asked respondent to participate in a drug and alcohol assessment.  In June 2019, Sanders received documentation from respondent indicating that she had been assessed by Rosecrance.  This documentation contained no recommendations for services, however, and it was not clear to Sanders whether Rosecrance performed a mental health assessment or a drug and alcohol assessment.  Sanders sought clarification from Rosecrance but never received a response.  Respondent participated in a substance abuse assessment through Rosecrance in August 2019, but Sanders had not received the results of that assessment at the time of the unfitness hearing.

¶ 16    According to Sanders, DCFS also asked respondent to participate in individual counseling. Sanders referred respondent to Hope Counseling three times, and even offered to arrange transportation.  Respondent refused to participate in counseling through that provider, insisting that she would find a therapist on her own.  Sanders told respondent that she could use any provider that she wanted, so long as respondent presented documentation confirming that her needs were being addressed.  Sanders received no documentation that respondent participated in therapy before the court changed the goal from reunification to termination.  Around August 2019, respondent started counseling and other services.

¶ 17    Sanders testified that DCFS asked respondent to participate in parenting classes. Respondent presented for an intake in March or April 2019 but never completed those services. Respondent told Sanders that the parenting class coordinator acted inappropriately by discussing respondent's medical information with a third party.  When Sanders asked the parenting class coordinator about that issue, the coordinator explained to Sanders that respondent had discussed her case with one of the coordinator's other clients.  Over respondent's hearsay objection, the court allowed Sanders to testify that the person who performed the parenting class intake had concerns about respondent's mental health.  Specifically, Sanders received a letter in May or June 2019 indicating that, if respondent were to continue the parenting classes, she would first have to work with a psychiatrist and a therapist to stabilize her condition.

¶ 18    Sanders testified that respondent mentioned having numerous jobs throughout the life of this case but never provided paystubs as requested.  Respondent also had trouble maintaining stable housing.   When the minor came into care, respondent was living in her own apartment. Respondent was later evicted from that apartment, and Sanders referred her to La Voz Latina multiple times for assistance.  Although respondent worked with La Voz Latina for a period of time, La Voz Latina ultimately "discharged" respondent for lack of attendance.  As of July 2019, respondent was living with her aunt.

¶ 19    Sanders testified that respondent initially had three-hour visits with the minor each Friday. During those visits, respondent would bring numerous things for the minor.  On the other hand, respondent discussed topics with the minor that Sanders deemed inappropriate, such as telling the minor not to call her foster parents "mom" and "dad."  In June 2019, respondent met with a psychologist because she was "exhibiting some mental health instability."  Around that time, DCFS personnel made the determination to put respondent's visits on hold until a therapist or

psychiatrist confirmed that she was stable enough to resume them. Respondent subsequently told Sanders that she missed the minor, and respondent expressed her desire to reinstate the visits. In the week before the unfitness hearing, respondent gave Sanders a letter from somebody who opined that respondent had stabilized. Sanders said that DCFS would consequently resume visits once per month.

¶ 20    Sanders identified People's Exhibits 1 through 3 as the service plans that she created. Respondent's counsel objected on the basis that the exhibits might contain hearsay. The court overruled that objection. Respondent did not object to the foundation for admitting these exhibits.

¶ 21    Following Sanders's testimony, the State asked the court to admit People's Exhibits 4 (the indicated packet), 5 (respondent's medical records from Crusader Clinic), and 6 (respondent's medical records from SwedishAmerican Hospital). Respondent's counsel objected only to the hearsay contained within the indicated packet. The court overruled that objection, promising that it would "sort the wheat from chaff." The court also took judicial notice of the neglect petition, the adjudicatory order, the dispositional order, and the order following the permanency review. The State then rested.

¶ 22    Respondent's counsel made a proffer that two counselors—who had treated respondent since August 2019 and were unavailable to testify on the day of the unfitness hearing—would testify that respondent was working through her issues and engaging in services. The court ruled that evidence of respondent's participation in services after the goal change was irrelevant to the unfitness proceedings.

¶ 23    Respondent then testified on her own behalf. In addition to the minor, she had three other children, ages 27, 17, and 12. None of those children resided with respondent as of the time of the hearing, and none of them were involved in this case.

¶ 24    Respondent explained that she was hospitalized three times for mental health issues during the life of this case.  She authorized Sanders to obtain the medical records relating to those hospitalizations.  At the time of the unfitness hearing, respondent was taking Effexor, Klonopin, and Norco.  Previously, she was prescribed Cymbalta, Hydrocodone, Tylenol with codeine, and Clonazepam.  Respondent testified that she showed some of these prescriptions to Sanders and offered to sign releases relating to other prescriptions.  Respondent insisted that the "Skittles" that Sanders mentioned in her testimony were Cymbalta pills.

¶ 25    Respondent acknowledged that she had resided in various locations recently, including with her aunt, with her cousin, in hotels, and in her current location in Machesney Park.  She had also worked at numerous jobs.  As of the time of the hearing, she worked at Cliffbreakers and McDonald's, where she recently received a promotion.  She testified that she had contacted La Voz Latina "[a]ll the time" for assistance with housing and employment, although she acknowledged that she missed some appointments when she was working or did not feel well.  She stopped working with La Voz Latina when she took a new job.

¶ 26    Respondent attributed her lack of completion of some of the services to transportation difficulties and scheduling conflicts with work.  She testified that she went to Rosecrance at least eight times, including twice for assessments.  Although she was presently engaging in a service that combined parenting classes with counseling, she acknowledged that she did not attend counseling before the goal change.

¶ 27    Respondent testified that she requested pictures of the minor and brought food and gifts to the minor.  Respondent attended the minor's medical appointments when she had advance notice and was not working.  She inquired regularly as to the minor's health.  Respondent's understanding was that there was some sort of "accident" that led to her being assigned a different transporter,

and she denied engaging in inappropriate conversation around the minor or the transporters.

¶ 28    The court found respondent unfit pursuant to both counts of the petition. In support of its conclusion on count I (failure to protect the minor from conditions within her environment that were injurious to her welfare), the court relied on the indicated packet and respondent's medical records. The court noted that those documents showed that (1) "[t]he minor was repeatedly exposed to lack of supervision while mother was reportedly intoxicated on multiple occasions," (2) respondent " 'had severe mental health issues' " and was " 'sometimes appearing incoherent during encounters with medical providers,' " and (3) respondent " 'used what appeared to be exaggerated injuries or phantom injuries to seek controlled substances.' " The court inferred from the medical records that respondent had a "severe substance abuse issue."

¶ 29    In support of its conclusion on count II (failure to maintain a reasonable degree of interest, concern, or responsibly as to the minor's welfare), the court recalled that Sanders testified that respondent needed to participate in services, including a mental health assessment, a drug and alcohol assessment, individual counseling, and parenting classes. The court explained:

> "[Respondent] did not initially complete an in-take procedure and I don't believe from the testimony did [*sic*]. There is no proof of a Mental Health Assessment prior to the goal change. There is no documentation or any therapy despite significant evidence of [respondent's] mental health issues. She never achieved stable housing. And visitation actually went from three hours per week supervised to eventually zero. She never progressed to unsupervised visitation. So Count 2 has been shown by clear and convincing evidence."

¶ 30                                    B. Best Interests Hearing

¶ 31    The matter subsequently proceeded to a best interests hearing.

¶ 32    Sanders testified that the minor, who was three years old at the time of the hearing, had resided with her foster parents (one of whom was respondent's cousin) since October 1, 2018. At some point, the minor displayed "difficult behaviors" in the foster home, so DCFS made a referral for "intensive placement stabilization" services. The minor made progress through "play therapy," and those services were terminated. The minor was now "well bonded" with and affectionate toward the foster parents. The foster parents took the minor to church and kept her engaged with activities such as swimming and tumbling. They also took her trick-or-treating on Halloween and brought her to see a Princesses on Ice show. The minor looked to the foster parents when she was hurt or needed something. They provided her with food, clothing, and shelter. When the minor was previously under treatment for a small heart murmur, the foster parents brought her to all necessary appointments. Sanders had been to the foster parents' home, and she deemed it safe and appropriate.

¶ 33    Sanders testified that the foster father had a teenage daughter and a younger son, who would both come and visit the family. The minor also had a relationship with her extended family, including respondent's mother. The foster parents were open to facilitating visits between the minor and her siblings. The difficulty in that regard was that the minor's siblings were not under DCFS's care, and Sanders was working with respondent's mother to facilitate that sibling contact. The foster parents were willing to adopt the minor and were willing to maintain respondent's contact with the minor. DCFS's position was that the minor should be freed for adoption.

¶ 34    Sanders also discussed respondent's relationship with the minor. Respondent's visits prior to June 2019 were "chaotic," because respondent would talk about her mental health and what was going on in her life. Respondent would interact with the minor only sporadically, and Sanders had to direct respondent to stay on task and interact with the minor. In June 2019, around the time

when certain contracted workers were refusing to transport respondent, DCFS suspended respondent's visits with the minor due to respondent's instability. DCFS resumed those visits in October 2019, after respondent presented a letter from a therapist at Rosecrance indicating that supervised visitation should continue. Although Sanders did not observe the first resumed visit in October, she was advised that respondent brought toys, gifts, and food for the minor. Sanders also read in the visitation notes that the minor was initially standoffish at that first visit but warmed up to respondent. Respondent, however, missed her most recent scheduled visit; the minor waited for an hour and was upset. Sanders noticed generally that the minor was bonded with respondent and referred to her as "mom." The minor turned to respondent for love and affection, and, for the most part, the minor had a very good relationship with respondent during visits.

¶ 35    Sanders further testified that respondent had recently changed medications. Additionally, although DCFS does not refer clients for services once the goal is changed to termination of parental rights, respondent recently began participating in services that she identified with the assistance of her attorney. Specifically, respondent was now engaged in all services that were originally requested of her, except for parenting classes (respondent referred herself to a parenting class, but the instructor was on maternity leave). Nevertheless, respondent had not completed any of those services. According to Sanders, even though it was not included in the service plan, respondent likely would have been recommended for parenting coaching, had she completed the parenting classes. Respondent appeared for all recent drug drops as requested.

¶ 36    Sanders testified that respondent sometimes attended the minor's doctor's appointments. Respondent had a problem with her knees and was unable to make one appointment. Respondent also left one of the minor's other appointments early.

¶ 37    At the conclusion of Sanders's testimony, the State sought to admit into evidence three

letters, which were written by respondent's mother and two aunts, respectively. Over respondent's objections, the court admitted those letters into evidence. At the State's request, the court also took judicial notice of the evidence from the unfitness hearing, as well as the reports that were submitted to the court in conjunction with the termination proceedings.

¶ 38    Respondent testified on her own behalf. She explained that she had a close attachment to the minor before DCFS got involved. By contrast, the foster parents were not involved in the minor's life during her first few years. Despite respondent's limited interaction with the minor after the case opened, the minor still called her "mom" and showed affection to her. Respondent had a good relationship with the minor, and respondent provided the minor with gifts and other items of support. When the visits resumed this past October, the minor ran up to respondent and held her tight. Respondent acknowledged that she missed the most recent scheduled visit because she failed to calendar the date and time. Respondent denied leaving any of the minor's medical appointments early. Respondent believed that it was in the minor's best interests to have respondent in her life, because respondent was her mother, conceived her, and loved her "to death."

¶ 39    Respondent explained that she recently began engaging in services as best she could, which she coordinated with the help of her lawyer. This included taking appropriate medication. Although she saw many doctors in the past, for the last three months, she had been seeing a new primary care physician. She just started a new full-time job at CVS Care, in addition to her work at Cliffbreakers and McDonald's. Addressing the unfavorable letters from her relatives that the State introduced into evidence, respondent explained that her aunts had minimal interaction with her and the minor. Respondent also stated that she was estranged from her mother.

¶ 40    At the conclusion of respondent's testimony, respondent submitted letters from three acquaintances. The State and the guardian *ad litem* objected that this evidence was irrelevant and

was not timely tendered in discovery. The court admitted the letters over those objections, indicating that it would give them the appropriate weight. The guardian *ad litem* introduced into evidence a photo album depicting the foster parents' life with the minor. That photo album is not included in the record on appeal.

¶ 41     The court found that it was in the minor's best interests to terminate respondent's parental rights. The court commended respondent for continuing services on her own after the court changed the goal to termination of parental rights. The court noted, however, the lack of evidence that those services cured, or in the foreseeable future would cure, the conditions that led to the removal of the minor. Nor was there any evidence presented as to whether respondent made progress in those services. In the court's view, to deny the State's petition would require the court to speculate as to how long it would take to reunite the minor with respondent, if that were even possible. The court determined that, even though respondent had a bond with the minor, the minor was integrated into her foster family. For example, the foster parents provided the minor with shelter and attended to her medical needs. Referring to the foster parents, the court noted that "this is [the minor's] family."

¶ 42     The court continued:

> "In looking and applying the best interest factors, it's clear by a preponderance of the evidence that it is in the best interest to terminate parental rights because that overriding need for permanency in the court's view is best served by allowing the adoption of [the minor] by this foster family."

The court indicated that it reviewed the letters submitted by the parties but did not "find them to be particularly determinative on either side," as they were hearsay. The court found that the photo album, however, was relevant and corroborated that the minor was part of her foster family.

¶ 43   Respondent timely appealed.

¶ 44                                  II. ANALYSIS

¶ 45   Respondent disputes the sufficiency of the evidence supporting the court's judgment as to both unfitness and the minor's bests interests. In challenging the unfitness findings, respondent presents numerous ancillary arguments that she did not raise below. The State, however, does not argue that respondent forfeited those arguments. See *People v. Lucas*, 231 Ill. 2d 169, 175 (2008) (the State may forfeit an argument that its opponent failed to preserve an issue for review).

¶ 46   Involuntary termination of parental rights under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq*. (West 2018)) is a two-step process. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). The State must first prove by clear and convincing evidence that the parent is unfit under any single ground listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *C.W.*, 199 Ill. 2d at 210. If the parent is unfit, the matter proceeds to a second hearing, at which the State must prove by a preponderance of the evidence that it is in the best interests of the minor to terminate parental rights. *In re D.T.*, 212 Ill. 2d 347, 352, 366 (2004). We will not disturb a finding of unfitness unless it is against the manifest weight of the evidence. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19. "A decision is against the manifest weight of the evidence where the opposite result is clearly evident from the record." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006).

¶ 47   The trial court found respondent unfit pursuant to both counts of the State's petition. We focus on count II. See *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 30 ("As the grounds for finding unfitness are independent, we may affirm the trial court's judgment if the evidence supports it on any one of the grounds alleged."). Section 1(D)(b) of the Adoption Act provides that a parent is unfit if she fails to "maintain a reasonable degree of interest, concern or

responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2018). In *B'yata I.*, we explained:

> "Since the language of the statute is in the disjunctive, any one of the three individual elements, *i.e.*, interest *or* concern *or* responsibility, may be considered by itself as a basis for unfitness. [Citations.] In determining whether a parent has shown a reasonable degree of interest, concern, or responsibility for a minor's welfare, a court considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare. [Citation.] Completion of service plans may also be considered evidence of a parent's interest, concern, or responsibility. [Citations.] The court must focus on the parent's efforts, not his or her success. [Citation.] In this regard, the court examines the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred. [Citation.] Accordingly, circumstances such as difficulty in obtaining transportation, poverty, actions and statements of others that hinder visitation, and the need to resolve other life issues are relevant. [Citations.] Furthermore, if personal visits with the child are somehow impractical, other methods of communication, such as letters, telephone calls, and gifts, may demonstrate a reasonable degree of interest, concern, or responsibility, depending upon the content, tone, and frequency of those contacts under the circumstances. [Citation.] We are mindful, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child. [Citation.] Rather, the interest, concern, or responsibility must be objectively reasonable." (Emphasis in original, and internal quotation marks omitted.) *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31.

¶ 48    The trial court's finding of unfitness was not against the manifest weight of the evidence. Respondent unquestionably loved the minor. Nevertheless, the court was entitled to find that respondent's level of responsibility was not objectively reasonable, especially in the period between when the minor was taken into protective custody and when the goal changed to termination of parental rights. Respondent missed multiple drug drops. When she did complete drug drops, she tested positive for opiates and benzodiazepines. The caseworker requested documentation from respondent to confirm that the positive tests were due to valid prescriptions, as respondent claimed, but respondent failed to provide that documentation. Respondent likewise failed to provide documentation that she completed the required mental health assessment. Furthermore, respondent declined to participate in individual counseling, even after the caseworker offered to arrange transportation. Respondent also failed to complete parenting classes, failed to provide paystubs to confirm that she was employed, and failed to maintain contact with resources who were willing to help her obtain employment and housing. Under these circumstances, we cannot say that it was clearly evident that the trial court's conclusion as to unfitness was erroneous.

¶ 49    In arguing to the contrary, respondent contends that: (1) that State failed to show that the services demanded by DCFS were necessary, (2) the State's evidence, including Sanders's testimony, consisted entirely of hearsay, which was insufficient to meet the State's burden, (3) the State failed to lay a proper foundation to admit the service plans and the indicated packet as business records, (4) those same exhibits contained multiple levels of hearsay, so the State was required to "provide hearsay exceptions for each level of hearsay," and (5) the State "should have made a proffer of what in each of the voluminous DCFS reports it intended to rely to prove unfitness." For the following reasons, none of these arguments provides a basis for disturbing the trial court's judgment as to respondent's unfitness.

¶ 50    With respect to respondent's first point, we have recognized that a trial court should not base its finding of unfitness on a respondent's "failure to comply with administrative directives that ha[ve] nothing to do with his ability as a parent." *In re A.J.*, 296 Ill. App. 3d 903, 916 (1998). That is not a concern here, however.  Respondent stipulated to the adjudicatory and dispositional orders, agreeing to engage in services relating to all counts of the neglect petition.  That explicitly included all drug, alcohol, and psychological treatment and services required by DCFS and its contracting agencies.  Respondent did not appeal the dispositional order.  Furthermore, the evidence at the unfitness hearing showed that the services that DCFS recommended for respondent were reasonable and necessary, and respondent did not argue to the contrary below.  Thus, this is not a case where the trial court terminated parental rights based on the failure to comply with questionable or merely technical administrative directives.

¶ 51    Respondent's contention that all the State's evidence was hearsay is likewise without merit. Sanders served as the minor's caseworker for the duration of this case, and she testified primarily to matters within her personal knowledge.  Respondent's assertion that Sanders's "entire testimony should have been excluded as rank hearsay" is misguided.

¶ 52    Respondent additionally challenges the admissibility of four of the State's exhibits.   The trial court, however, properly admitted the indicated packet pursuant to section 2-18(4)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-18(4)(b) (West 2018)), which provides that "[a]ny indicated report filed pursuant to the Abused and Neglected Child Reporting Act shall be admissible in evidence."  The service plans too were admissible as business records, so long as the State demonstrated that the documents were "(1) made as a memorandum or record of the event, (2) made in the ordinary course of business, and (3) made at the time of the event or within a reasonable time thereafter." *In re A.B.*, 308 Ill. App. 3d 227, 235 (1999); see also 705 ILCS 405/2-

18(4)(a) (West 2018)). Respondent notes that DCFS's employees did not witness all the acts and occurrences that were referenced in the State's exhibits. That, however, is not a barrier to admissibility. See *A.B.*, 308 Ill. App. 3d at 235 ("The author of the writing need not testify or be shown to be unavailable; anyone familiar with the business and its procedures may testify about how the writing was prepared."); 705 ILCS 405/2-18(4)(a) (West 2018) (lack of personal knowledge affects the weight of the documentary evidence, not its admissibility).

¶ 53    Respondent correctly notes that Sanders was not asked whether the service plans were made at the time of the events referenced or within a reasonable time thereafter. Had respondent raised this objection during the unfitness hearing, the prosecutor likely could have asked Sanders a follow-up question or two to complete the foundation. Nevertheless, assuming that it was error for the court to admit the four disputed exhibits into evidence, we hold that any error was harmless. As explained above, Sanders's testimony—which was based primarily on her personal observations and her interactions with respondent and others—provided a sufficient basis for the trial court to conclude that respondent failed to maintain a reasonable degree of responsibility as to the minor's welfare. We note that, in explaining its findings on count II of the petition, the trial court relied on Sanders's testimony without mentioning the exhibits that respondent claims were improperly admitted.

¶ 54    Apart from her arguments pertaining to the foundation for the State's exhibits, respondent maintains that these exhibits contained multiple levels of hearsay. According to respondent, the State was required to provide hearsay exceptions for each level of hearsay. The State insists that respondent's arguments go toward the weight to be attributed to the documentary evidence, not admissibility. In so arguing, the State criticizes some of the cases that respondent cites and reminds us that we are not bound by the decisions of other districts of the appellate court. We need not

address whether the State must identify hearsay exceptions for each level of hearsay that is contained within documents that are otherwise admissible as business records. As explained above, the trial court did not mention the disputed documentary evidence when explaining its ruling on count II of the petition, and Sanders offered competent testimony that supported the court's decision. Any error in admitting the State's exhibits was thus harmless.

¶ 55    Respondent's final argument with respect to the unfitness finding appears to be rooted in due process concerns. Respondent complains that the State made her "sift[ ] through hundreds of pages of reports to determine which of the thousands of hearsay statements upon which the state and court wish to rely, and whether the record of the hearsay event was made at or near the time of the occurrence." According to respondent, the State "should have made a proffer of what in each of the voluminous DCFS reports it intended to rely to prove unfitness." In respondent's view, "[m]erely pointing at a stack of records does not constitute 'notice' adequate to allow a parent to prepare a proper defense to the state's case."

¶ 56    We find no error. Respondent does not claim that the State failed to timely tender its documentary evidence in discovery. Nor did respondent ever request on the record for the State to make a proffer of the type that she now claims would have been appropriate. Furthermore, the two cases that respondent cites—*In re J.P.*, 316 Ill. App. 3d 652 (2000), and *In re K.S.*, 365 Ill. App. 3d 566 (2006)—are inapposite, as they involved evidentiary irregularities that are not present here. Specifically, in *J.P.*, in support of its best interests finding, the trial court cited facts that were outside of the evidentiary record. *J.P.*, 316 Ill. App. 3d at 662-63. The trial court did not make that error here. In *K.S.*, we reversed a dispositional order, along with an order requiring the respondent to engage in a sex offender evaluation, where the State introduced no evidence showing that the respondent engaged in sexual misconduct. *K.S.*, 365 Ill. App. 3d at 575, 578. Unlike the

parent in *K.S.*, respondent stipulated that the minor was neglected, agreed to the dispositional order, and never challenged in the trial court the propriety of the services that DCFS recommended for her.

¶ 57 For all these reasons, we reject respondent's arguments that the court improperly determined that she was an unfit parent.

¶ 58 After the court makes a finding of parental unfitness, "the focus shifts to the child." *D.T.*, 212 Ill. 2d at 364. Specifically, the court must consider whether it is in the best interests of the child to terminate parental rights. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 41. At the best interests hearing, the trial court considers:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child."  705 ILCS 405/1-3(4.05) (West 2018).

We will not overturn the trial court's finding that termination of parental rights is in the child's best interests unless it is against the manifest weight of the evidence.  *In re Shru. R.*, 2014 IL App (4th) 140275, ¶ 24.

¶ 59    We hold that the trial court's finding that it was in the best interests of the minor to terminate respondent's parental rights was not against the manifest weight of the evidence.  At the time of the best interests hearing, the minor was three years old and had lived with her foster parents, who were her relatives, for more than a year.  The foster parents offered the minor stability and a safe home.  They enrolled her in activities within the community.  They were willing to adopt her, facilitate her contact with her siblings, and maintain her relationship with respondent. Although respondent undoubtedly loved the minor, she plainly had not progressed to the point where the court could feel confident that it could return the minor to her care in the near future. Like the trial court, we commend respondent for working toward improving her life after the court changed the goal from reunification to termination.  We encourage respondent to continue those efforts.  Nevertheless, the evidence showed that the minor's interests would be best served by freeing the minor for adoption by her foster parents.

¶ 60    In arguing that the court's best interests finding was against the manifest weight of the evidence, respondent mentions that (1) she and the minor had a bond, (2) she was "actively

engaged in services" at the time of the hearing, (3) she provided food, clothing, and toys for the minor during visits, (4) there was no explanation given for why the case proceeded so quickly to termination of parental rights, and (5) there was no evidence as to what the impact would be on the minor if the respondent were to lose her parental rights. Respondent also reiterates her argument that the State failed to prove that the services demanded of her were necessary.

¶ 61     Respondent is correct that the evidence showed that the minor was bonded with her. The evidence also showed that the minor was bonded with the foster parents. With respect to respondent's claim that she actively engaged in services, the trial court was entitled to conclude that respondent's participation in services was too late, as she did not make meaningful efforts toward reunification until the goal had changed; nor was there evidence of respondent's progress in those services. Moreover, although respondent provided the minor with food, clothing, and toys during visits, the foster parents attended to the minor's needs daily. Furthermore, contrary to what respondent argues, the record confirms that the reason why the case proceeded to termination of parental rights in a relatively expedited fashion is that respondent was not engaging in services and was not stable enough to continue visits with the minor. As to the fifth item that respondent mentions, respondent's counsel was free to question Sanders about the potential effects on the minor of terminating respondent's parental rights. Although that might be a relevant issue, we are aware of no authority holding that the attorneys' failure to explore such matters requires reversal of an order terminating parental rights. Finally, for the reasons explained above, we again reject respondent's argument that the State failed to prove the necessity of her recommended services.

¶ 62                                III. CONCLUSION

¶ 63     For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 64     Affirmed.