2020 IL App (2d) 200323-U
No. 2-20-0323
Order filed September 28, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* A.P, K.P., and E.P, Minors. | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| | ) ) ) ) | No. 16-JA-363     16-JA-364     16-JA-365 |
| (The People of the State of Illinois, Petitioner-Appellee v. Brandon P., Respondent-Appellant). | ) ) ) | Honorable Mary Linn Green, Judge, Presiding. |

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice Birkett and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The court allowed respondent's counsel's motion for leave to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and affirmed the trial court's order terminating respondent's parental rights.

¶ 2   On December 4, 2019, the trial court determined that respondent, Brandon P., was unfit to parent A.P., K.P., and E.P. On June 4, 2020, the trial court determined that it was in the children's best interests that respondent's parental rights be terminated. Respondent's appointed counsel has filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), asserting that

there are no issues of arguable merit to be raised on respondent's behalf. For the reasons set forth below, we grant counsel's motion and affirm the trial court's findings.

¶ 3                                    I.  BACKGROUND

¶ 4      On October 20, 2016, the State filed three five-count neglect petitions alleging that respondent's three children, four-year-old E.P., two-year-old K.P. and one-year-old A.P. were neglected. The three petitions had identical counts and alleged that the child's environment was injurious to his welfare pursuant to section 2-3(b)(1) of the Juvenile Court Act of 1987 (Act). 705 ILCS 405/2-3(b)(1) (West 2016). The specific counts were as follows: the children's home was unsanitary (count I); respondent and the children's biological mother were not compliant with intact services (count II); the minors' mother had a substance abuse problem that prevented her from properly parenting (count III); respondent had a substance abuse problem that prevented him from properly parenting (count IV); and cleaning supplies and beer cars were within reach of the children (count V).

¶ 5      On November 4, 2016, the Youth Services Network (YSN) filed a report with the court in support of a temporary custody order. The report was dated October 3, 2016, and noted that this was the second environmental neglect case for the family. Respondent was not compliant with intact services and recommendations since the case was opened. He continued to consume alcohol in the home. There were beer cans and bottles seen inside and outside of the home in reach of the children. The home was infested with fleas from the animals in the home, and there were gnats and flies in the home. The reporter noted that K.P. stayed with respondent and the biological mother from April 5, 2016 to May 7, 2016. When the YSN reporter picked K.P. up from the home the child smelled strongly of feces. There were dogs in the home that urinated and defecated on the carpet. The toilet in the home appeared to have been falling through the ceiling. K.P was filthy

with dirt and dried food on his body. Upon returning to his foster home K.P. had over 10 bruises on his legs. The biological mother said that K.P. fell a lot. K.P. also had a thorn in the bottom of his foot that was infected.

¶ 6       The reporter said that since September 12, 2016, respondent had not made adequate progress in his service case. The home remained dirty with animal stains on the carpet, piles of dirty dishes, and old food in the kitchen. The kitchen floor was filthy and there were fruit flies and possible fleas in the home. There were toys and clothes all over the floor. When the reporter arrived, she learned that E.P. was locked in a room. The biological mother said that E.P. had locked himself in the room and that she had lost the key. The mother used a screwdriver to unlock the lock. There were reports of verbal domestic situations in the home. The children all appeared as if they had not been bathed. The reporter sent respondent for a drug drop that came back negative. The report was signed by Aleshia Hudson, a YSN child welfare specialist, and Mary Ellen Commare, YSN's executive director.

¶ 7       On November 4, 2016, respondent waived a temporary custody hearing and the case was continued for adjudicatory hearing on the neglect petitions. The adjudicatory hearing was held on January 12, 2017. At the hearing respondent called Heather Rutenber as a witness. Rutenber testified that she was a case worker with Children's Home and Aid Society (CHASI) and that she had been a previous caseworker for the family. The reports that Rutenber read in the case file indicated that respondent drank to excess. In the past respondent had admitted to her that he used alcohol, and the children's mother also told her that respondent drank excessively.

¶ 8       Respondent also called Nicole Kral, a Department of Children and Family Services (DCFS) caseworker, to testify. Kral had never met respondent in person and had only spoken to him on the telephone. Kral said that she went into the house that respondent and the children's mother shared

on September 12, 2016. The house was messy but there were not any immediate safety hazards to the children. The carpet was stained but she did not see any feces on it. There were dirty dishes in the sink. There was a baby gate in place blocking the children from the kitchen. The children were appropriately clothed, but their hygiene was only fair. They were dirty, but not so much that Kral was concerned. The gas was not working in the home at that time. Kral returned to the home on September 22, 2016 and the gas was back on.

¶ 9    After the hearing, the State withdrew counts II and V in the neglect petition. On January 24, 2017, the court found that the State had met is burden by at least a preponderance of the evidence as to counts I, III and IV in the petition and that there was an urgent and immediate necessity to remove the minors from the home and put them into shelter care. Temporary guardianship was given to DCFS, who was given the discretion to place with children with a relative or in foster care. The parties reached an agreement as to disposition and that agreement was approved by the court.  Respondent was found unfit or unable to care for the children at that time and DCFS maintained guardianship over the children with discretion to place them in foster or relative care. The court also ordered that respondent would receive a minimum of three hours' visitation weekly.

¶ 10    A permanency review hearing was held on July 25, 2017. The guardian *ad litem* (GAL) indicated that respondent had been doing well, although he still had some challenges with parenting and finding new housing after separating from the children's biological mother. However,  he was working on those problems. The State and the GAL recommended a goal of return home within five months. The court found that respondent had made reasonable efforts and that reasonable progress would not be determined until the next permanency hearing. It set the goal as return home within five months.

¶ 11    The next permanency hearing was held on December 18, 2017, and the court maintained the goal of returning the children to respondent within five months. At the March 2, 2018, permanency review hearing the parties agreed to stand on the DCFS service plan and the CHASI report and not present any further evidence. In the service plan DCFS noted that respondent was no longer living with the children's mother but continued to reside in the home from which the children were removed. Respondent reported that he had obtained full time employment. Visitation took place at the CHASI office on Saturdays. Respondent struggled with setting boundaries, rules and limits with the children. He allowed them to scream when they did not get their way. He also chased two of the children around the building while the other child was using the restroom. He had been advised that his behavior was inappropriate. DCFS also reported that it became aware of a 2006 DUI and felony destruction of conviction that respondent had not disclosed. Respondent had a pending driving while license suspended and petty offense charge from 2016. Respondent's counsel then asked the court to consider that respondent had completed parenting classes after the service plan had been filed. The court maintained the goal as return home within five months. It found that respondent had made reasonable efforts but not reasonable progress.

¶ 12    A permanency review hearing set for May 29, 2018, was continued because respondent's counsel moved to withdraw due to lack of contact with respondent. Several continuances were had thereafter, and the next permanency review hearing was held on February 13, 2019. Between those two hearings CHASI had filed two reports and DCFS had filed two service plans and a report.

¶ 13    At the beginning of the hearing the State asked the court to take judicial notice of "the report." Judicial notice was taken. The State asked that the court find respondent had not made reasonable efforts or progress based upon the information provided in the case report. The GAL reported that since the last permanency hearing respondent had digressed severely to the point

where the GAL had serious concerns about him. Respondent's visits with the children were suspended in their entirety in December 2018 because he either did not show up for the visits without first cancelling them or he would cancel at the last minute. The children were disappointed and angry when these visits did not occur. The GAL noted that the children were adjudicated neglected on January 24, 2017, which was over two years prior. She agreed with the State that the court should find that respondent had not made reasonable efforts or progress. Respondent's counsel informed the court that in speaking with respondent he agreed that he had lost focus and needed to work harder to get his children back. Counsel asked the court to make no adverse findings regarding respondent's efforts or progress.

¶ 14    The DCFS report of January 18, 2019, indicated that respondent still struggled with improving his parenting skills with all three of his children. Visit coaches as well as parenting coaches were added to assist respondent with improving his parenting skills. The case aides reported that during the visits the children at times hit the respondent, screamed, spat on the table, jumped on the furniture, and pounded on the windows, all without any consequences from respondent. One of the children almost choked himself when he twisted himself in a curtain. Respondent cancelled visitations many times or was a no-show. The visits were suspended in December 2018 and a child and family team meeting with respondent was scheduled for January 9, 2019. Respondent did not show for the meeting.

¶ 15    Respondent was arrested for domestic battery with great bodily harm on September 13, 2018. The victim of the alleged crime was respondent's live-in girlfriend. Respondent had weekly supervised phone calls with his children, but the phone calls did not go well. All the children spoke at once and respondent did not know how to ask them to speak separately or ask them specific

questions even after he had been coached to do so. Parenting coaching was terminated after respondent repeatedly failed to contact the coach.

¶ 16   At the conclusion of the hearing the court entered an order finding that respondent had failed to make reasonable efforts or progress. The goal was changed to return home within one year. The next hearing was set for August 12, 2019.

¶ 17   At the hearing on August 12, 2019, respondent did not appear even though he was seen outside the building a short time earlier. No testimony was taken. The parties stood on the DCFS report dated August 7, 2019. That report indicated that respondent had tested positive for cocaine and had missed a substantial number of random drug screens. The court found that respondent had not made reasonable efforts or progress. The goal was changed to substitute care pending a determination of termination of parental rights.

¶ 18   On August 29, 2019, the State filed motions to terminate respondent's parental rights to A.P., K.P. and E.P. The motions were identical for each of the three children and alleged that respondent was an unfit parent in that: he failed to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2018) (count I)); he failed to protect the children from conditions within their environment that were injurious to their welfare (750 ILCS 50/1(D)(g) (West 2018) (count II)); he failed to make reasonable efforts to correct the conditions that caused the children to be removed during a nine month period after the neglect adjudications (750 ILCS 50/1(D)(m)(i) (West 2018) (count III; time period 3/2/18 to 12/2/18 or 11/2/18 to 8/2/19); he failed to make reasonable progress toward the return of the children to him during a nine month period after the neglect adjudications (750 ILCS 50/1(D)(m)(ii) (West 2018) (count IV; time period 3/2/18 to 12/2/18 or 11/2/18 to 8/2/19)). The State also alleged that it was in the children's best interest that respondent's parental rights be

terminated and that DCFS be appointed legal guardian with the power to consent to the adoption of the children.

¶ 19    The unfitness hearing was held on October 10, 2019. The State moved to admit the DCFS indicated packet and the motion was allowed. The court also took judicial notice of all other petitions and orders entered in the case.

¶ 20    Rutenber testified that except for five months, she had been the children's caseworker from the time this case started. At the beginning of the case she created an integrated assessment (IA) for respondent. An IA is a document that details a parent's social history including education, mental health history and whether the parent was involved with DCFS as a child. CHASI uses the IA to create a service plan for the parent. Respondent's IA was entered into evidence without objection.

¶ 21    Respondent's IA recommended that he attend parenting classes. The service plan also included a substance abuse assessment and random drug drops. Respondent gave seven drug drops but missed eleven drops between August 2017 and August 2019. He tested positive for cocaine one time. Respondent completed a parenting class in December 2017.  The reference to parenting classes remained on respondent's subsequent service plans because he continued having problems setting limits, boundaries, and expectations for his children. He also failed to provide effective ways of giving the children consequences for their inappropriate behavior. The children were aggressive toward each other and respondent during visits. Respondent was also inconsistent with his visitation. He would not call to cancel the visits and then he would not show up. There were times when respondent would call and cancel a very short time before a visit when the children were standing at the door, which confused and upset the children.

¶ 22    Rutenber said that K.P. had severe kidney disease, but respondent never got involved in his medical care even though he was offered an opportunity to do so. Respondent's service plan also required that Rutenber receive monthly pay stubs from respondent, but she only received those sporadically. She also received proof of paid utility bills on an inconsistent basis. Finally, Rutenber said that she never was able to move toward placing the children with respondent or giving him unsupervised visitation. He still had problems with effective parenting skills. He had been arrested for domestic violence. Respondent was referred to domestic counseling, but he did not feel that it was necessary. The domestic violence charge against him was dismissed in March 2019.

¶ 23    On cross-examination Rutenber said that it was an oversight that the random drug drops were not included as part of respondent's service plan until the last two plans. However, respondent was ordered by the court to refrain from alcohol or drugs.  There were indications from the beginning of the case that respondent had an alcohol problem. Respondent was referred to individual counseling around March 2018. He only attended forty percent of those sessions. He said he missed counseling sessions due to transportation and phone issues. However, a bus pass was provided to respondent and he told Rutenber that he used Uber a lot for travel since he did not have a driver's license. Respondent was also referred for parent coaching but that was terminated for his lack of attendance.

¶ 24    The unfitness hearing was continued to December 4, 2019. The GAL began with its cross-examination of Rutenber. Rutenber said that respondent was told about K.P.'s doctor appointments for his kidney disease but he did not attend any of them or ask what happened after those appointments. If the children were returned to respondent today, he would still have extreme difficulty parenting them.

¶ 25    On re-direct Rutenber said that respondent had been discharged from individual counseling in December 2018 for his lack of attendance, making excuses as to why he could not attend, and not showing up at appointments without canceling. Respondent had never completed individual counseling, which had been a part of his service plan. Visits were suspended for two and a half months between November 2018 and May 2019 because of respondent's many last-minute cancellations and no-shows. This caused a great amount of sadness and confusion in the children.

¶ 26    The State rested and respondent testified on his own behalf. He said that since this case began, he had visited with his children consistently. During the visits he usually brought the children dinner and they all sat down at a table and ate. After dinner they all cleaned up together and the children would play with the toys respondent provided. Rutenber had only been present at three of those visits. He only missed his individual counseling sessions because he was at work. He also had transportation issues. He had taken steps to fix the transportation issues by going to the Department of Motor Vehicles and asking what he needed to do to get his driver's license reinstated. He then followed through with those recommendations and paid his fines. He was currently waiting for a letter from the Secretary of State. He had an old phone that did not work in the past, which caused communication problems. However, he now had a new phone.

¶ 27    Respondent said that his interactions with Rutenber had been very unpleasant. Since he had split up with the children's biological mother Rutenber had been "railroading" him. She pushed off his services until the last possible moment and then she would only give him one service at a time. It took nine and a half months for him to get parenting classes, and he offered to personally pay for those classes. Respondent said that he had been ignored when he sent emails, text messages and made phone calls. He did ask about the children, and on a few Halloweens he

received pictures of them. He admitted that Rutenber did not have anything to do with him missing counseling appointments and being unsuccessfully discharged.

¶ 28    On cross-examination by the GAL respondent said that when he was not receiving communications from Rutenber he called her supervisor, Kris Vaccarello, but did not receive a response. He did not file an appeal regarding his services because he did not know he had such a right.

¶ 29    On re-direct, Rutenber testified that she had informed respondent that her cell phone was personal and that she would not respond to texts sent to that phone. She did respond by email and left respondent voice mails. She never refused to communicate with respondent.

¶ 30    After hearing arguments from counsel, the trial court found that the evidence showed respondent had missed several visits with his children. There was never any movement toward placing the children back in the respondent's care. Also, he was discharged from counseling and he missed several drug drops. Although respondent said that he did not know that he had a right to appeal his service plan if he had a problem with a caseworker, the evidence showed that respondent had attended several administrative case reviews where his appeal rights were outlined for him. Accordingly, the court determined that the State had proven respondent was an unfit parent by clear and convincing evidence under counts I, II, III, and IV of the State's neglect petition.

¶ 31    The best interests hearing was held on June 4, 2020. Rutenber testified that at that time E.P. was eight-years-old, K.P. was six-years-old and A.P. was four-years-old. The children had been placed with a friend of the biological mother for the last four years since they had come into care. The children know the rules in the foster mother's home and the consequences for breaking a rule. All the children are up to date on their medical visits. The family had received two laptops from a charity so that they could continue their education remotely. The foster mother helped the

children with eLearning. The foster mother takes K.P to Lurie Children's Hospital for treatment of his kidney disease. K.P. is on medication and his kidney function has been improving. All three of the children are thriving in the foster home. The children call the foster parents mom and dad, and they are all thriving in their foster home. The children are in counseling through video chats. It was Rutenber's opinion that it was in the children's best interests that respondent's parental rights be terminated.

¶ 32    The GAL called the foster mother, Louise Konnagan, as a witness. Konnagan said that she had been the children's foster mother since November 2016. Konnagan said she never viewed respondent's children as different than her biological children. They were always included in birthdays and holidays. She was financially able to provide for the children and she was willing to adopt them. Konnagan's oldest child was 13 years' old. He wrote a letter to the court that was admitted into evidence. In the letter the boy said that his little brothers have been the best things that have happened to him over the last several years and that they had become part of his family.

¶ 33    Konnagan's mother, Nancy Bush, also wrote a letter to the court that was admitted into evidence. In the letter Bush said that her daughter and her daughter's husband, Matthew Konnagan, would be great parents to the children. Bush considered E.P., K.P. and A.P. to be her grandchildren along with the three Konnagan children. They are one big family and she considers herself blessed to have six grandchildren.

¶ 34    After hearing the parties' arguments the trial court said that it had considered the statutory best interests factors as they related to each of the children's ages and developmental stages as applied to the evidence presented, testimony, documentary evidence and arguments of counsel. Having done so, the court found that the State had proven that it was in the children's best interests that the respondent's parental rights be terminated.

¶ 35                                  II. ANALYSIS

¶ 36    The Juvenile Court Act of 1987 (Act) provides a bifurcated procedure for the involuntary termination of parental rights. 705 ILCS 405/2–29(2) (West 2018).  Under this procedure, the State must make a threshold showing of parental unfitness.  *In re Adoption of Syck*, 138 Ill. 2d 255, 277 (1990).  If a court finds a parent unfit, the State must then show that termination of parental rights would serve the minor's best interest. *In re M.I.*, 2016 IL 120232, ¶ 20.

¶ 37    On July 23, 2020, appellate counsel filed a motion to withdraw pursuant to *Anders v. California,* 386 U.S. 738, and filed a memorandum arguing that the trial court did not err in finding respondent to be an unfit parent or in terminating respondent's parental rights.  Counsel discussed the evidence in the record and explained why he believed these issues lack merit. Respondent has not responded to counsel's motion to withdraw.  We review both the unfitness finding and the order terminating respondent's parental rights.

¶ 38                                  A.  Unfitness

¶ 39    With regard to the finding of unfitness, counsel argues that the trial court's finding that respondent failed to maintain a reasonable degree of interest, concern or responsibility as to A.P., K.P. and E.P.'s welfare (750 ILCS 50/1(b) (West 2018)) as well as his failure to make reasonable progress (750 ILCS 50/1(D)(m)(ii) (West 2018)) was not against the manifest weight of the evidence.  Specifically, counsel points out that respondent refused many drug drops; his visits with the children were inconsistent and when he did visit them, he could not control their behavior; he did not provide Rutenber with copies of utility and other bills as required in the service plans; and he was discharged from individual counseling for failure to appear on many occasions.

¶ 40    Section 1(D) of the Adoption Act lists various grounds under which a parent may be found unfit. 750 ILCS 50/1(D) (West 2018). As the grounds for finding unfitness are independent,

evidence supporting any one of the alleged statutory grounds is sufficient to uphold a finding of unfitness. *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 30. The State has the burden of proving a parent's unfitness by clear and convincing evidence. *Id.* ¶ 29. A determination of parental unfitness involves factual findings and credibility assessments that the trial court is in the best position to make. *Id.* Therefore, a trial court's determination of a parent's unfitness will not be reversed unless it is against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence if a review of the record demonstrates that the proper result is the opposite of the one reached by the trial court. *In re Brianna B.*, 334 Ill. App. 3d 651, 656 (2002).

¶ 41    Here, the trial court's determination that respondent was an unfit parent was not against the manifest weight of the evidence. In addition to the failings noted by counsel, respondent did not appear to show any concern for K.P.'s severe kidney disease. He never asked to attend any of K.P.'s medical appointments, and he never asked anyone what happened after those appointments.

¶ 42    Along with his individual counseling sessions, respondent's parenting coaching sessions were cancelled due to his many cancellations and no-shows. DCFS provided those coaching sessions to help respondent acquire better parenting skills, but he never showed any interest in doing so. He had no control over the children during his visitations, and at times his lack of skills created safety issues for the children. Even when his in-person visitations were suspended and DCFS set up a child and family meeting with respondent, he did not attend that meeting. When he was only granted telephone visitations, respondent failed to take the advice of the case aides to ask the children questions individually so that the children were not talking over each other. This evidence overwhelmingly demonstrated that respondent failed to take advantage of the services offered to him that might have made him a fit parent for his children. For all these reasons, we hold that the trial court properly determined respondent was an unfit parent based upon his failure

to maintain a reasonable degree of interest, concern or responsibility as to A.P., K.P. and E.P.'s welfare (750 ILCS 50/1(D)(b) (West 2018)). Since sufficient evidence supporting any one of the alleged statutory grounds is sufficient to uphold a finding of unfitness (*In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 30), we need not review the remaining findings of unfitness.

¶ 43                                 B.  Best Interests

¶ 44     Counsel also argues that the trial court did not err in terminating respondent's parental rights to A.P., K.P. and E.P.  He notes that the children have lived in the same foster home since this case began and that the children have bonded with the foster parents, their  biological children, as well as the foster mother's mother. Also, the children's needs were being met, the foster family could financially support the children and they wished to adopt them.

¶ 45     As our supreme court has noted, at the best interest phase, "[t]he parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004).  Section 1–3(4.05) of the Act sets forth various factors for the trial court to consider in assessing a child's best interest. These considerations include: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background; (4) the child's sense of attachment; (5) the child's wishes and long-term goals; (6) the child's ties to the community; (7) the child's need for permanence; (8) the uniqueness of every family and every child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. 705 ILCS 405/1–3(4.05) (West 2018).  The State bears the burden of proving by a preponderance of the evidence that termination is in the best interest of a minor.  *D.T.*, 212 Ill. 2d at 366.  Like the unfitness determination, we review the trial court's best interests finding under the manifest weight of the evidence standard. *B'yata I.*, 2014 IL App (2d) 130558–B, ¶ 41.

¶ 46     We also agree with counsel that no meritorious argument can be made that the trial court's decision to terminate respondent's parental rights was against the manifest weight of the evidence. Considering the statutory factors a trial court must consider at a best interest hearing, many of those factors weigh in favor of termination.  Here, A.P., K.P. and E.P. have been with their foster family for almost four years. The foster family clearly treats the children like their own biological children, celebrating all birthdays and holidays with them. The children have bonded with their foster parents, their children, and the foster mother's mother. The foster home is a stable one where the children are being raised to follow rules and appropriate behavior is expected. All the evidence at the best interest hearing indicated that the children were flourishing in this environment. For all these reasons, we affirm the trial court's determination that it was in A.P., K.P. and E.P.'s best interests to terminate the respondent's parental rights.

¶ 47                                 III. CONCLUSION

¶ 48     After carefully examining the record, the motion to withdraw, and the memorandum in support of the motion, we agree with appellate counsel that no meritorious issues exist that would warrant relief on appeal.  Therefore, we allow counsel's motion to withdraw from this appeal, and we affirm the judgment of the circuit court of Winnebago County finding respondent to be an unfit parent and terminating his parental rights to A.P., K.P. and E.P.

¶ 49     The judgment of the circuit court of Winnebago County is affirmed.

¶ 50     Affirmed.