NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210123-U

NO. 4-21-0123

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 26, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* H.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
| Petitioner-Appellee, | ) | No. 18JA33 |
| v. | ) | |
| Colby B., | ) | Honorable |
| | ) | John C. Wooleyhan, |
| Respondent-Appellant). | ) | Judge Presiding. |
| | ) | |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Harris and Holder White concurred in the judgment.

**ORDER**

¶ 1     *Held*:    The trial court's finding of unfitness was not against the manifest weight of the evidence.

¶ 2     In April 2018, the State filed a petition for adjudication of wardship as to H.B. (born in October 2017), the minor child of respondent, Colby B. In September 2018, the trial court adjudicated the minor neglected. After an October 2018 dispositional hearing, the court (1) found respondent unfit, unwilling, and unable to care for the minor, (2) made the minor a ward of the court, and (3) placed the minor's custody and guardianship with the Department of Children and Family Services (DCFS).

¶ 3     The State filed a motion to terminate respondent's parental rights in August 2019. Following a hearing on the State's motion in February 2021, the court found respondent an "unfit person" within the meaning of sections 1(D)(m)(i) and 1(D)(m)(ii) of the Adoption Act (750 ILCS

50/1(D)(m)(i), (ii) (West 2018)). The court immediately held a best-interests hearing, where the court found it was in the minor's best interests to terminate respondent's parental rights.

¶ 4        On appeal, respondent argues the trial court erred in finding that he was an unfit person. He does not challenge the court's best-interest finding. We affirm.

¶ 5                                    I. BACKGROUND

¶ 6        On April 6, 2018, the State filed a petition for adjudication of wardship, alleging H.B. was "a [n]eglected and/or [a]bused minor by reason of the following facts." The petition alleged the minor's mother, Brittany B., who is not a party to this appeal, arrived at the emergency room of Blessing Hospital on April 5, 2018, with injuries from a domestic violence incident with respondent. The minor was present during this incident. According to the petition, respondent put Brittany in a "choke hold" and struck her head on the bathtub, causing her to lose consciousness. Hospital personnel noticed Brittany's nose was swollen and bruised and she had bruising at various stages of healing all over her body. Respondent was arrested as a result of this incident. H.B. was taken into protective custody.

¶ 7        On September 4, 2018, the trial court issued an adjudicatory order finding the minor neglected as defined by section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)) in that the minor was in an environment injurious to her welfare. The court found both parents had inflicted the abuse or neglect.

¶ 8        The trial court issued a dispositional order on October 30, 2018, finding respondent unfit, unable, and unwilling, for reasons other than financial circumstances alone, to care for, protect, train, educate, supervise, or discipline the minor, and placement with him was contrary to the minor's health, safety, and best interests because respondent "[was] charged with [two] counts of aggravated domestic battery to [m]other. [Respondent] has failed to cooperate with DCFS.

[Respondent] has not sought substance abuse services, as directed[,] nor has he started domestic violence counseling." The court granted the State's petition, adjudicated the minor neglected, and made her a ward of the court. The court ordered DCFS to maintain custody and guardianship over the child. The court also ordered no visitation between the minor and respondent until further court order.

¶ 9        On August 14, 2019, the State filed a motion for termination of the parental rights of respondent to H.B. The State alleged respondent was an unfit person pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). The State's petition identified two counts as to respondent as follows: (1) he has failed to make reasonable efforts to correct the conditions which were the basis for the removal of the minor from the parent (750 ILCS 50/1(D)(m)(i) (West 2018)); and (2) he has failed to make reasonable progress toward the return of the minor to the parent within any nine-month time period after an adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2018)). The State further contended termination of respondent's parental rights was in the minor's best interests and asked for custody and guardianship to remain with DCFS, giving it the authority to consent to the minor's adoption.

¶ 10        On July 21, 2020, the State filed its second-amended notice identifying the nine-month periods on which it intended to present evidence, namely: September 4, 2018, to June 3, 2019; June 4, 2019, to March 3, 2020; and November 7, 2019, to August 6, 2020.

¶ 11        On February 23, 2021, the trial court held a fitness hearing. Respondent attended the hearing represented by counsel. The State called one witness: Alison Ketsenburg, the DCFS caseworker. She said she prepared the case plans involved, which, according to the initial plan dated May 18, 2018, required respondent to participate in substance abuse treatment, mental health counseling, domestic violence perpetrator services, visitation with the minor, parenting classes,

and to cooperate with DCFS.

¶ 12    When the second plan was approved on October 15, 2018, respondent's progress was rated overall unsatisfactory, as he had failed to (1) follow through with substance abuse treatment and mental health counseling, (2) initiate domestic violence services, (3) visit with the minor because contact had been suspended by the trial court, (4) maintain contact with DCFS, and (5) secure a referral for parenting services because of the lack of contact.

¶ 13    At the time of the third plan, which was approved on May 2, 2019, respondent's progress was rated satisfactory on his substance abuse, mental health, domestic violence, and cooperation tasks. According to Ketsenburg, respondent had completed inpatient substance abuse treatment, was attending counseling, was attending and engaged in domestic violence services, and was keeping her informed of his progress. His progress was rated unsatisfactory on his tasks of visitation and parenting, both because of the continued no-contact court order.

¶ 14    Ketsenburg testified that at the time of respondent's fourth plan on October 7, 2019, respondent's progress was rated satisfactory on all tasks except substance abuse. He had relapsed during the summer of 2019. He failed to appear for a drug screen on April 30, 2019, but attended one the next day, which showed a negative result. However, according to Ketsenburg, the sample showed it was "adulterated." After a negative screen on May 14, 2019, respondent failed to appear for the next five requests between June 28, 2019, and September 18, 2019. On September 25, 2019, he tested positive for methamphetamine and amphetamines.

¶ 15    At the time of his fifth plan, dated March 27, 2020, the goal had been changed from "return home" to "substitute care pending court determination," and respondent's progress was rated unsatisfactory. Ketsenburg testified respondent refused to sign consents to release information, which made it impossible for Ketsenburg to determine whether respondent was

following the recommendations of his doctor regarding his prescribed medication. Ketsenburg testified respondent's substance abuse therapist "stated that it was hard to tell whether or not [respondent] was continuing—if he was using substances." Respondent had also failed to appear for drug screens. Additionally, Ketsenburg testified respondent's mental health therapist said she had not seen respondent since January 2020. He had cancelled or failed to show four times.

¶ 16 During Ketsenburg's testimony regarding the various case plans, respondent's counsel made several objections and finally a continuing objection to her testimony as hearsay. The trial court overruled the objection and stated:

> "She can testify about the plan that she has testified that she created. She can testify about evaluations that were done on that plan and the source of that information for why she gave certain evaluations that she did. She can tell what the evaluations were and what she did.
>
> As far as the truth of what someone else said to her, it's not being offered for that. It's being simply as a reason for why she did what she did."

No other evidence was presented at the hearing.

¶ 17 After the parties presented argument, the trial court found respondent was unfit. The court stated:

> "The People today have introduced into evidence certain exhibits labeled as service plans, among others. Under the statute and the case law, the Court is allowed to consider those service plans and have them be properly admitted into evidence at a hearing like this. And there has been testimony regarding certain evaluations or ratings that were given to the parents on each of those service plans and the tasks that they were given to complete which is also proper evidence.

However, the Court is not allowed to or should not rely solely and only on what those evaluations may have been on a particular service plan. Instead, the Court has to consider all the evidence presented and to determine the fitness of the parents in relation to the needs of the child and not rely solely and only on whatever the evaluations or ratings may have been on the service plans. So that is what the Court is doing here today to look at all the evidence to decide the issues."

¶ 18 The trial court noted the relevant time frames as alleged by the State and the grounds upon which the State was proceeding. The court found respondent "at different times was involved in some services and not others, did complete some services and did not complete others." The court noted the "many situations and instances when [respondent] failed or refused to sign a consent for release of information from various service providers." Due to respondent's decision not to sign the releases, DCFS was unable to obtain certain information "with regard to being engaged in services or having completed services."

¶ 19 The trial court also commented on the visitation status between the minor and respondent. After the visits were reinstated in April 2019, they continued to be supervised without any request or recommendation for unsupervised visits "largely because of [respondent] also having at least one relapse." The court found the allegations of unfitness against respondent had been proved by clear and convincing evidence.

¶ 20 The trial court immediately conducted a best-interest hearing, again presented with only Ketsenburg's testimony. She said H.B., who was then three years old, had lived in the same foster home since coming into care at the age of five months. Ketsenburg said H.B. was "[v]ery well-bonded between all members of the family." H.B. calls her foster parents "mom" and "dad" and appears to trust them, as she seeks support and comfort from them during visits. Her foster

parents have expressed their willingness to adopt H.B.

¶ 21    After considering this evidence, the trial court found termination of respondent's parental rights was in the best interests of H.B.

¶ 22    This appeal followed.

¶ 23                                    II. ANALYSIS

¶ 24    Section 2-29 of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2018)) "sets forth a two-step process for the involuntary termination of parental rights." *In re M.I.*, 2016 IL 120232, ¶ 20. First, the court must find, by clear and convincing evidence, that "[the] parent is an unfit person as defined in Section 1 of the Adoption Act [(750 ILCS 50/1 (West 2018))]." 705 ILCS 405/2-29(2) (West 2018). After a finding of parental unfitness is made, the court then considers whether termination of the parent's rights is in the minor's "best interest." *Id.* In the present case, respondent only challenges the court's determination that he was an unfit person under the Adoption Act.

¶ 25    "A reviewing court accords great deference to a trial court's finding of parental unfitness, and such a finding will not be disturbed on appeal unless it is against the manifest weight of the evidence." *In re M.C.*, 2018 IL App (4th) 180144, ¶ 22. "A court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." (Internal quotation marks omitted.) *Id.*

¶ 26    Following the fitness hearing, the trial court determined respondent was an unfit person based upon both grounds alleged by the State. However, in order to affirm the court's judgment, we need only find that the State sufficiently established respondent was an unfit person on a single ground. See *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 30 ("As the grounds for finding unfitness are independent, we may affirm the trial court's judgment if the evidence

supports it on any one of the grounds alleged."). Here, we find the trial court's determination that the State proved respondent was an unfit person under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)) was not against the manifest weight of the evidence.

¶ 27    Section 1(D)(m)(ii) of the Adoption Act states that a parent is an unfit person if he fails to "make reasonable progress toward the return of the child to [him] during any 9-month period following the adjudication of neglect[ ] or abuse[ ] *** under Section 2-3 of the Juvenile Court Act of 1987." 750 ILCS 50/1(D)(m)(ii) (West 2018). We have previously determined that:

> " 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original and internal quotation marks omitted.) *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 51.

Further, reasonable progress is measured by a parent's "compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." (Internal quotation marks omitted.) *Id.* ¶ 50. Finally, "in determining whether a parent has made reasonable progress toward the return of the child, courts are to consider evidence occurring only during the relevant nine-month period mandated in section 1(D)(m)." *In re J.L.*, 236 Ill. 2d 329, 341 (2010).

¶ 28    Here, the trial court found respondent failed to make reasonable progress during all the nine-month periods alleged. The evidence presented at the fitness hearing demonstrated that at no point during those periods was the minor close to being returned to respondent's care. Specifically, for example, respondent was prohibited from visiting with H.B. until the beginning of May 2019. After that, his visits were closely supervised. Although respondent had successfully engaged in several services by May 2019, his successes were short-lived. He relapsed during the summer of 2019 by using methamphetamines, and he failed to appear for drug screens between June 2019 and September 2019, at which time he tested positive for methamphetamine and amphetamines. His visits with H.B. were reduced after his relapse. Respondent's substance abuse treatment provider advised DCFS that it was difficult to tell whether respondent was "using" again. Respondent had refused to sign consents for the release of information from his doctor—a doctor who had previously prescribed Subutex, a drug used for opioid addiction. He was not compliant with his mental health counseling task, as he had advised Ketsenburg that he did not need mental health counseling and had cancelled or failed to show four times between October 2019 and January 2020, at which time he stopped attending all together.

¶ 29    The evidence presented at the fitness hearing showed that not only was respondent not in compliance with most of his services during the alleged time frames, but at no time during the life of the case was the trial court able to conclude that it would be able to order the minor returned to respondent's custody in the near future. See *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). We disagree with respondent's contention that the evidence against him was "limited to ratings" on the service plans. Rather, the trial court heard competent evidence from Ketsenburg that respondent failed to substantially fulfill his obligations and make demonstrable movement toward the return of the minor.

¶ 30        In light of the evidence presented at the fitness hearing, we cannot say that the trial court's finding that respondent was an unfit person was against the manifest weight of the evidence.

¶ 31                              III. CONCLUSION

¶ 32        For the reasons stated, we affirm the trial court's judgment.

¶ 33        Affirmed.